947 F.2d 1563
 60 USLW 2415, 21 Fed.R.Serv.3d 100,
14 Employee Benefits Cas. 2407
 Neil A. USEDEN, As Trustee of The Air Florida System, Inc.,
Profit Sharing Plan & Trust, Plaintiff-Appellant,
v.
C. Edward ACKER, et al., Defendants,
Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A.,
Sun Bank of Miami, N.A. and Sun Bank, Inc.,
Defendants-Appellees.
 No. 90-5445.
 United States Court of Appeals,
Eleventh Circuit.
 Dec. 11, 1991.
 
 Edward A. Kaufman, Miami, Fla., for plaintiff-appellant.
 Nina K. Brown, Irving M. Miller, Miami, Fla., for Sun Bank.
 Joseph H. Lowe, Miami, Fla., for Greenberg Traurig.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HATCHETT and BIRCH, Circuit Judges, and RONEY, Senior Circuit Judge.
 BIRCH, Circuit Judge:
 
 
 1
 In this appeal we decide whether the conduct of a bank and a law firm renders those entities fiduciaries under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 (1988) ("ERISA" or "Act"). We also decide whether ERISA provides a right of action for monetary damages against non-fiduciaries who knowingly participate in a breach by a fiduciary.
 
 
 2
 Plaintiff-appellant Neil A. Useden, as trustee to a profit sharing plan and trust (the "Plan") governed by ERISA, appeals the grant of summary judgment by the United States District Court for the Southern District of Florida in favor of defendant-appellees Sun Bank and Greenberg, Traurig. In his Order on Motions for Summary Judgment, Judge Kenneth L. Ryskamp determined that, on the undisputed facts, neither Sun Bank as a lender to the Plan nor the law firm of Greenberg, Traurig as attorneys for the Plan were fiduciaries of the Plan within the meaning of ERISA. The court also determined that no cause of action lay against defendant Greenberg, Traurig as a non-fiduciary who knowingly participated in a breach by a fiduciary. Further, Judge Ryskamp believed that the undisputed facts did not support such non-fiduciary liability notwithstanding the rejection of plaintiff's legal theory.
 
 
 3
 In its appeal, the Plan additionally assigns error to the district court's denial of leave to amend the Plan's complaint to include a cause of action for non-fiduciary liability against Sun Bank, the court's striking of the untimely affidavit of a former trustee to the Plan, the court's finding that extracontractual and punitive damages were unavailable under the ERISA theories asserted, and finally, the court's conclusion that Regulation U, 12 C.F.R. § 221 (1990) (pertaining to the Federal Reserve Board's "margin rules"), did not provide a borrower with a private right of action for damages. We agree with the district court's finding that the conduct of these defendants did not make them fiduciaries. We also hold that the plain meaning of ERISA does not impose liability on non-fiduciaries for acting with fiduciaries who breach fiduciary duties. Finding no error with respect to the remaining issues, we AFFIRM.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 4
 Air Florida System, Inc. and Air Florida, Inc. (collectively "Air Florida") established the Air Florida System, Inc. Profit Sharing Plan and Trust in 1977 as an "eligible individual account plan" under ERISA. The Plan's mission was to absorb contributions made by Air Florida as an employer, to invest exclusively in the securities of Air Florida, and to distribute these securities to eligible Plan participants. Useden, the current named trustee of the Plan, was appointed in May 1984. Useden instituted the present action in January 1985 after determining that the Plan's assets had been dissipated through a series of financial transactions entered into by his predecessors. These transactions involved Sun Bank and Greenberg, Traurig in their respective capacities as a lending bank and attorneys to the company and the Plan.
 
 
 5
 Because Useden's predecessors were also officers of Air Florida, they not only presided over the financial decline of the Plan, they also over-saw the demise of the airline. The trustee of the Plan from creation to July 1982 was Eli Timoner, who was Air Florida's President and Chief Operating Officer and later its Chief Executive Officer and Chairman of the Board. Timoner's successor, Donald Lloyd-Jones, assumed his duties as trustee of the Plan some time after Timoner suffered a debilitating stroke in July 1982. Lloyd-Jones also assumed all of Timoner's corporate duties upon Timoner's stroke.[1]
 
 
 6
 By the time Useden became Plan trustee in May 1984, Air Florida was in a protracted state of financial distress. A number of events precipitated the airline's crisis. The August 1981 departure of Chief Executive Officer and Chairman of the Board Edward Acker, a recognized industry personality who brought clout and expertise to the fledgling airline, was a highly adverse development. The August 1981 strike of the Professional Air Traffic Controllers and the attendant reductions in operating levels also had its costly effects. During 1981, in addition, Pan American World Airways waged a fare war on Air Florida's crucial New York to Miami route. Also damaging was the public relations disaster that ensued when an Air Florida aircraft crashed on takeoff from National Airport in January 1982. In July 1984, Air Florida filed for bankruptcy.
 
 
 7
 Within the context of the adverse events of the early 1980's and the accompanying financial decline of Air Florida, the Plan's investments in Air Florida securities also deteriorated. For their part in the transactions underlying these investments, Sun Bank and Greenberg, Traurig are now sued by the Plan under ERISA and related legal theories. The chief theories upon which Useden proceeds are conceptually unified insofar as they all require a determination that the defendants' professional functions so penetrated the governance of the Plan that they should share the potential liability of the Plan's named fiduciaries.
 
 1. Sun Bank
 
 8
 During the period relevant to this litigation, Sun Bank was in a commercial lending relationship with both the Plan and Air Florida. Sun Bank's first pertinent involvement with the Plan revolved around a nine-month, short term loan of $1.6 million issued in June 1981. The Plan used the loan to purchase 76,000 discounted shares of Air Florida stock from Great American Life Insurance Company ("GALIC"). Because GALIC was then presently in the process of disposing of the greater part of its substantial holdings in Air Florida, the Plan was able to acquire GALIC's restricted (but preferred) shares at the same discounted price that GALIC had made available to another buyer. The Plan intended to repay the loan with the Air Florida contributions to the Plan earmarked to be made in early 1982. The collateral pledged to secure the loan was comprised of the 76,000 purchased shares plus 40,000 shares of common Air Florida stock already owned by the Plan.
 
 
 9
 At closing, Sun Bank took possession of the stock collateral. At that time, certain powers governed by the terms of the loan and banking industry custom vested in Sun Bank. First, the loan documents, in addition to the promissory note and related documents, included an agreement between Plan sponsor Air Florida and Sun Bank whereby the company would, in the event of a default on the loan, produce an S-16 registration statement as required under applicable securities laws. This statement would enable Sun Bank to sell the stock held as collateral; absent such registration, the loan collateral would be subject to a two-year holding period. Second, the bank gained authority to require additional collateral and to convert the preferred shares into common in the event of a monetary default.[2] The bank implemented these insecurity provisions within the framework of a 70% margin call, a convention in commercial lending whereby the Plan could be required to furnish additional collateral should the value of the collateral stock fall below 130% of the loan balance.[3]
 
 
 10
 In January 1982, the value of the stock pledged as collateral on the loan fell below the 130% margin requirement. Thus, in the same month that Air Florida was greeted with the news that one of its airplanes had crashed on takeoff in Washington, D.C., the Plan was informed by Sun Bank that the contemporaneous decline in the market value of Air Florida stock necessitated additional collateral under the margin requirements of the loan. Due to this shortfall in collateral, Plan sponsor Air Florida undertook to guaranty the loan to the Plan.
 
 
 11
 In the opinion of the Plan attorneys, Greenberg, Traurig, ERISA prohibited the guaranty of a loan to a profit sharing plan by that plan's sponsor.[4] Air Florida, therefore, passed a resolution to effect the conversion of the existing profit sharing plan into an Employee Stock Ownership Plan ("ESOP"). Presumably, with the Plan structured as an ESOP, the guaranty by Air Florida would be permissible. Air Florida then guaranteed the $1.6 million loan. Due to the continuing decrease in the value of the stock originally pledged as collateral and the persistent out-of-margin status of the loan, both the Plan and Air Florida pledged additional collateral at various times during the first half of 1982.
 
 
 12
 Hopes for timely repayment of the outstanding loan obligation were finally dashed in early March 1982, when Air Florida informed Sun Bank that the airline would forego the contribution to the Plan slated for early 1982, manifestly rendering the Plan unable to satisfy its obligation on the loan before the passing of the March 26 maturity date. Sun Bank, following negotiations with the Plan, renewed the underlying promissory note in June 1982 and set a due date of March 31, 1983. As a result of the negotiations that continued through this time, some $297,000 of cash collateral then being held was applied to reduce the outstanding loan balance of $1.6 million.
 
 
 13
 Sun Bank's insecurity persisted. As a result, in August 1982 Sun Bank demanded full payment on the principal loan balance. Negotiations that ensued between the bank and the Plan cumulated in an amendment and redocumentation of the loan, with satisfaction of the outstanding balance set to be due, once again, on March 31, 1983. In the fall of 1982, Sun Bank exercised its power to sell stock held as collateral in order to reduce the outstanding balance. Again, in July 1983, Sun Bank liquidated collateral after the Plan defaulted on the loan by failing to satisfy the full balance on March 31. The unsold collateral, in the form of Air Florida preferred and common stock, was then returned to the Plan.
 
 
 14
 The decline in the value of Air Florida stock and Sun Bank's liquidation of collateral consumed the Plan economically. By year end 1983, net available assets held by the Plan had been dissipated from a June 1981 level of $3,340,000 to $35,000.
 
 2. Greenberg, Traurig
 
 15
 Like Sun Bank, Greenberg, Traurig rendered services to both the Plan and to Air Florida itself. Greenberg, Traurig drafted the Plan and provided legal services to it from its inception until December 1982; the firm also provided services to Air Florida from the early 1970's until August 1982. Even though Greenberg, Traurig acted as independent outside counsel and performed services primarily on an as-requested basis, the law firm's involvement with the Plan was substantial. For example, at least partly on its own initiative, Greenberg, Traurig prepared several Plan amendments between 1977 and 1980. These amendments related to calculating and determining employer contributions, discerning types of investments permitted under the Plan, and including an Air Florida subsidiary as a sponsor.
 
 
 16
 Greenberg, Traurig became involved in the events directly relevant to this litigation when Eli Timoner contacted the firm about the prospective purchase of GALIC-owned Air Florida stock. Caesar Alvarez, the Plan's contact at Greenberg, Traurig, advised the Plan that the transaction would comply with the Plan documents and with applicable ERISA provisions. The firm accordingly provided legal services associated with the loan from Sun Bank and the acquisition of GALIC shares. Incident to formulating its opinion that the transaction was permissible, Greenberg, Traurig needed to determine whether the trustee to the Plan had considered the prudency of the investment as required by ERISA. See 29 U.S.C. § 1104(a)(1)(C) (1988). The record leaves unclear the extent to which Greenberg, Traurig itself commented independently on the business or financial prudency of the purchase.
 
 
 17
 In September 1981, during a period of sharp decline in the value of Air Florida stock, Timoner asked the Plan's securities brokerage about the possibility of disposing of the Plan's holdings in Air Florida. The brokerage advised that although such a sale was possible, public disclosure would be required under the applicable securities laws. In this connection, Greenberg, Traurig told the Plan that this opinion concerning public disclosure of the transaction was correct. Timoner then determined that such a disposition, coupled with the required public disclosure, would collapse the market value of the shares--an outcome certainly detrimental to the company, and harmful to the Plan as well because the balance of any shares remaining with the Plan would bring significantly lower value.
 
 
 18
 Through the fall of 1981, the price of Air Florida stock continued to decline, prompting Sun Bank's first demand for additional security. Greenberg, Traurig was consulted in connection with the permissibility, under ERISA, of Air Florida guaranteeing the Plan's loan, and advised that the company could not guaranty the Plan's debt in compliance with ERISA, but proposed that such a guaranty would be permissible if the existing profit sharing plan were converted into an ESOP. Accordingly, a resolution was passed to so transform the Plan, and Air Florida guaranteed the loan. The documentation needed to complete the conversion from profit sharing plan to ESOP, however, was never completed. Nevertheless, in transactions after January, Sun Bank and Air Florida repeatedly referred to the plan as an ESOP or stock ownership plan without consulting Greenberg, Traurig.
 
 
 19
 When Sun Bank called the loan in August 1982, Greenberg, Traurig prepared a response letter and assisted in negotiations with the bank. Attorneys at Greenberg, Traurig, advised that the Plan had no choice but to sign the letter agreement produced by the negotiations. There is evidence suggesting that attorneys at the firm knew or should have known that the redocumentation (involving the reincorporation of the January pledge of corporate assets to secure the loan) offended applicable ERISA principles. An attorney from the firm wrote to Air Florida in December 1982, setting forth the available options--specifically, the completion of the conversion to an ESOP or a Department of Labor administrative exemption--for avoiding a violation of ERISA in light of the company's guaranty of the loan earlier that year. This letter did not receive a response.
 
 
 20
 During the fall of 1982 and 1983, Greenberg, Traurig's role in the facts relevant to this appeal gradually diminished. Incoming trustee and corporate officer Lloyd-Jones replaced the firm as Air Florida's counsel with Debevoise & Plimpton in August 1982. He would also replace Greenberg, Traurig as counsel to the Plan in the summer of 1983.
 
 3. Proceedings Below
 
 21
 Appellant filed suit against Sun Bank and others on January 2, 1985, amending the complaint as of right 5 days later. The Plan was granted leave to amend a second time in March 1987, and its Second Amended Complaint named Greenberg, Traurig as a defendant. The district court denied a motion to amend the complaint a third time in July 1987.
 
 
 22
 In November 1988, the parties to this appeal moved for summary judgment. The hearing on these motions was set for December 15, and took place on December 15 and 16. Although the discovery deadline was October 15 pursuant to the order of the district court, appellant filed an affidavit taken from Donald Lloyd-Jones on December 14 at 4:49 p.m. in support of its memoranda in opposition to the appellees' motions for summary judgment. At the hearing the next day, appellant moved ore tenus to amend the Second Amended Complaint to include a count against Sun Bank alleging liability as a non-fiduciary knowingly participating in a fiduciary breach.
 
 
 23
 On March 30, 1989, the district court docketed its Order on Motions for Summary Judgment ("March 30 order"), striking the Lloyd-Jones affidavit as untimely, denying appellant's ore tenus motion to amend, and granting summary judgment to Sun Bank and Greenberg, Traurig on the issues of fiduciary and non-fiduciary liability. Useden v. Acker, 721 F.Supp. 1233 (S.D.Fla.1989). On appellant's motion, the district court certified the March 30 order for appeal pursuant to Fed.R.Civ.P. 54(b) on May 16. To this, appellees responded that several issues remained unadjudicated by the March 30 order, specifically, appellant's action for violations of Regulation U and the possible application of the statute of limitations. On July 28, 1989, this court dismissed appellant's notice of appeal as premature. Accordingly, on September 8, 1989, the district court issued a Second Order specifically adjudicating the remaining issues, vacating its earlier Rule 54(b) certification, and recertifying the case for appeal. Useden v. Acker, 734 F.Supp. 978 (S.D.Fla.1989). Appellant does not appeal the district court's denial of its own motion for summary judgment.
 
 II. DISCUSSION
 1. Jurisdiction
 
 24
 Appellees argue that this court lacks jurisdiction to decide some of the issues pursued in this appeal on grounds related to the fact that the district court issued two different summary judgment orders. In essence, appellees urge us to ignore the issues of substantive rights raised in this litigation due to an alleged technical filing defect.
 
 
 25
 Specifically, they note that appellant filed his first notice of appeal from the March 30 order simultaneously with his motion for certification for appeal under Rule 54(b). This notice of appeal, therefore, was filed prior to the district court's Rule 54(b) certification of the order on May 16, 1989.[5] Appellant, moreover, failed to correct the mistake by noticing a new appeal within 30 days following the May 16 certification, as required by Fed.R.App.P. 4(a)(1).[6] See McLaughlin v. City of LaGrange, 662 F.2d 1385, 1387 (11th Cir.1981) (per curiam), cert. denied, 456 U.S. 979, 102 S.Ct. 2249, 72 L.Ed.2d 856 (1982). The filing of a timely notice of appeal under Rule 4(a)(1) is a jurisdictional prerequisite. Burnam v. Amoco Container Co., 738 F.2d 1230, 1231 (11th Cir.1984) (per curiam). Indeed, this court dismissed appellant's first appeal as premature in its July 28, 1989 order:
 
 
 26
 The district court's March 30, 1989 order was not final and appealable because it did not dispose of all the claims of all the parties to the action. This appeal filed prior to the entry of the district court's Rule 54(b) certification was premature and ineffective. The district court's Rule 54(b) certification did not cure the premature appeal; a new notice of appeal following the certification order is necessary to perfect an appeal from the summary judgment order.
 
 
 27
 Order of the Eleventh Circuit, No. 5416, July 28, 1989, R54-1401 (citations omitted). As a result, appellees argue, appellant has lost his ability to appeal the rulings encompassed in the March 30 order. Therefore, appellees urge that our review be restricted to the content of the September 8 order of the district court, which admittedly was timely appealed.
 
 
 28
 Our resolution of this issue requires us to examine the district court's circumvention of Rule 4(a)(1) for an abuse of discretion. In order to permit a timely appeal of all issues notwithstanding the lapse of the 4(a)(1) time limit, the trial court vacated the May 16 Rule 54(b) certification and reentered a new certification on September 8, 1989; this move initiated a fresh 30-day time limit for filing a notice of appeal.[7] For our purposes, the effect of the Second Order of September 8 is best characterized as a relief from final judgment under Fed.R.Civ.P. 60(b).[8] Rule 60, though, does not sanction the use of this tactic for the naked purpose of enabling the filing of a timely appeal. Tucker v. Commonwealth Land Title Ins. Co., 800 F.2d 1054, 1056 (11th Cir.1986) (per curiam). Moreover, the clear meaning of Fed.R.Civ.P. 77(d) precludes appellant from relying on mere lack of notice as grounds for Rule 60(b) relief.[9]
 
 
 29
 This circuit has recognized, however, that Rule 60(b) is an appropriate escape valve when counsel has acted diligently and in reliance upon statements of the trial court. Harnish v. Manatee County, 783 F.2d 1535, 1538 (11th Cir.1986). The instant case presents just such a scenario. From a review of the proceedings below, it is evident that counsel for appellant was, to a significant extent, induced by the conduct of the trial court to forego the filing of a new notice of appeal following the May 16 certification order. Most importantly, the district court decided on May 18 to hold a hearing on May 25 concerning the possible nonfinality of its March 30 summary judgment order. This inquiry into the character of the order was prompted by Sun Bank's Response in Opposition to Plaintiff's Motion for 54(b) Certification, wherein Sun Bank had first asserted that there remained unresolved claims that rendered the 54(b) certification premature. Thus, in close temporal proximity with the entry of the May 16 Rule 54(b) order (docketed May 22), the district court cast doubt on that same order by inviting arguments regarding the nonfinality of the underlying March 30 order.
 
 
 30
 At the May 25 hearing, the court acknowledged that certain issues were left unresolved by the March 30 order and expressed a firm intention to remedy the procedural posture of the case:
 
 
 31
 [T]his is not a final order and there are other issues, and as I contemplated it, I said let's get all the other issues resolved and then I will certify those and the [Circuit] Court can consider the whole thing.
 
 
 32
 * * * * * *
 
 
 33
 I might as well give them every issue to rule upon as long as they are going to have it.
 
 
 34
 * * * * * *
 
 
 35
 Let's hear all these issues so we can at least give the Court of Appeal everything to consider.
 
 
 36
 Transcript of May 25, 1989, R62-1072-3-9. The district court's apparent realization of the nonfinal character of the March 30 order, coupled with the judge's express intention to somehow posture the case for a comprehensive appeal, plausibly indicated an intention to alter or amend the 54(b) certification.[10] In light of the suspect status of the May 16 certification order, appellant's failure to file a second notice of appeal was understandable, especially considering that this court had not yet ruled on the prematurity of the March 30 Notice of Appeal.
 
 
 37
 Through the procedural mechanism of vacating the earlier, premature Rule 54(b) certification, "the court avoided the manifest injustice worked by a rigid application of the provisions of Rule 77(d) to the above-recited facts." Harnish, 783 F.2d at 1539. We therefore hold that the district court acted within its discretion in vacating its earlier orders on summary judgment and Rule 54(b) certification. Accordingly, we take jurisdiction to decide all the issues adjudicated below and argued by the parties on appeal.
 
 2. The Lloyd-Jones Affidavit
 
 38
 In its March 30 Order on Motions for Summary Judgment, the district court struck the affidavit of Donald Lloyd-Jones, filed literally on the eve of the hearing on motions for summary judgment, as untimely. We will not consider the document in our review of this case unless the district judge abused his discretion in striking the affidavit. Clinkscales v. Chevron U.S.A., Inc., 831 F.2d 1565, 1568 (11th Cir.1987). In Clinkscales, this court ruled that the district court judge did not abuse his discretion in refusing to accept an affidavit untimely filed under the local rules. We stated: "Absent an affirmative showing by the non-moving party of excusable neglect according to Fed.R.Civ.P. 6(b), a court does not abuse its discretion in refusing to accept out-of-time affidavits." Id. (footnote omitted).[11]
 
 
 39
 In the instant case, appellant Useden procured the affidavit in issue from a key witness--a former Plan trustee--incident to a last-minute settlement with that witness. Appellant then sought to file the affidavit well after both the deadline imposed by the local rule and the already-enlarged deadline of the district court (October 15, 1988). See S.D.Fla. Local Rule 10 C & J (affidavits in opposition to a motion for summary judgment are to be filed along with the memorandum of law, due ten days after service of the motion).
 
 
 40
 The content of the affidavit was not newly discovered evidence extracted from a previously missing source. The affiant was available to the appellant throughout the course of discovery and in fact provided extensive deposition testimony apart from the affidavit. That the affidavit could only be obtained upon a compromise settlement did not earn it an exemption from the district court's discovery cutoff. We decline to hold that the late hour of the settlement deal was by itself sufficient to establish "excusable neglect" under Rule 6(b). The district court, we therefore find, was well within its discretion in striking the untimely affidavit. See Clinkscales, 831 F.2d at 1568-69.
 
 3. Fiduciary Status Under ERISA
 
 41
 a. Standard of Review
 
 
 42
 Useden appeals from the district court's order granting summary judgment in favor of Sun Bank and Greenberg, Traurig. On appeal, parties seeking affirmance of summary judgment bear the exacting burden of demonstrating that no genuine dispute exists as to any material fact in the case. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); see also Fed.R.Civ.P. 56(c). In assessing whether the movants have met this burden, we review the evidence and all factual inferences arising from the evidence in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157, 90 S.Ct. at 1608. A district court's order granting summary judgment is subject to de novo review by this court, Thompson v. Metropolitan Multi-List, Inc., 934 F.2d 1566, 1570 (11th Cir.1991), and we apply the same legal standards that control the district court in determining whether summary judgment is appropriate. Buxton v. City of Plant City, 871 F.2d 1037, 1040 (11th Cir.1989).
 
 
 43
 Appellees, proposing something of a departure from these standards, urge us to adopt a relaxed standard of review for all cases in which the district court judge, rather than a jury, would be the ultimate trier of fact were the action to proceed to trial. In this case, Judge Ryskamp would be the finder of fact at trial,[12] and he has already considered a comprehensive body of affidavits, depositions and other matters of record. These circumstances may suggest that the judge is in an enhanced position to draw inferences and resolve the action without resorting to the expense of trial. As this court's predecessor has explained:
 
 
 44
 If decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved.... A trial on the merits would reveal no additional data.... The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial.
 
 
 45
 Nunez v. Superior Oil Co., 572 F.2d 1119, 1123-24 (5th Cir.1978). Cf. Coats & Clark, Inc. v. Gay, 755 F.2d 1506, 1509 (11th Cir.), cert. denied, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985) (emphasizing that Nunez entreats caution, especially where a jury trial would be pretermitted by summary judgment). Relying on Nunez, appellees assert that a "clearly erroneous" standard of review is appropriate in this case. Cf. Fed.R.Civ.P. 52.
 
 
 46
 While "[s]ummary judgment procedure is [not] properly regarded as a disfavored procedural shortcut," Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986), this circuit's predecessor has acknowledged that it is nonetheless "a 'lethal weapon' capable of 'overkill.' " Nunez, 572 F.2d at 1123 (quoting Brunswick v. Vineberg, 370 F.2d 605, 612 (5th Cir.1959)). An understanding of these considerations guided this court Hiram Walker & Sons, Inc. v. Kirk Line, 877 F.2d 1508 (11th Cir.1989). There, this court addressed and rejected the same argument for applying the clearly erroneous test as that advanced by the present appellees. We concluded it would not be prudent to accord a presumption of correctness to the district court's findings of fact when it had disregarded contradictory evidence and drawn inferences against the non-movant. Id. at 1513 n. 4. We decline in this case to depart from Hiram Walker.
 
 
 47
 This position benefits from an accurate assessment of the scope of the Nunez holding. Nunez addressed whether the trial judge should draw inferences from uncontroverted facts at the summary judgment stage. It therefore speaks only to the appropriate stage of trial at which inferences from undisputed facts may be drawn, not the level of deference to be accorded those inferences on appeal.[13] An ERISA case, Phillips v. Amoco Oil Co., 614 F.Supp. 694 (N.D.Ala.1985), aff'd, 799 F.2d 1464 (11th Cir.1986), cert. denied, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987), erroneously relied upon by appellees, is illustrative of this distinction. There, the trial court cited Nunez and Coats in holding that questions of intent or motive are appropriate for summary judgment if the underlying facts are not disputed and the central question in the case is whether, as a matter of law, the alleged conduct violates ERISA. Phillips, 614 F.Supp. at 723 n. 35. On appeal, this court praised the "comprehensive, thorough, and well reasoned" opinion of the district court, but did not opt to subject the lower court's grant of summary judgment to merely a "clearly erroneous" test. Phillips, 799 F.2d at 1467-68. In this case, as in Phillips, the wisdom of the Nunez opinion informs the conduct of the trial court in drawing its inferences from the evidence, not the standard of review adopted by this court of appeal. We therefore decline as this court did in Hiram Walker to pioneer the application of a relaxed test in reviewing the grant of summary judgment.[14] We examine the conclusions reached below de novo.
 
 
 48
 b. Sun Bank
 
 
 49
 Appellant's fiduciary claims against Sun Bank turn primarily on the theory that the bank acquired fiduciary status when it exercised its powers under the insecurity provisions of the 1981 loan of $1.6 million. ERISA Section 502(a)(2), 29 U.S.C. § 1132(a)(2) (1988), empowers a plan fiduciary to bring a civil action for relief under Section 409 against a breaching fiduciary. Section 409 provides:
 
 
 50
 Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate....
 
 
 51
 29 U.S.C. § 1109(a) (1988). Appellant proceeds under this liability provision in seeking monetary damages against Sun Bank, alleging that the bank's actions against the Plan under the loan terms amounted to an exercise of discretionary authority or control over Plan assets such that it acquired fiduciary status.
 
 
 52
 ERISA Section 3(21)(A) defines a fiduciary not simply in terms of certain designated offices, but also more flexibly, with reference to the functions performed by a person:
 
 
 53
 [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.
 
 
 54
 29 U.S.C. § 1002(21)(A) (1988).[15] Thus, ERISA contemplates that fiduciary responsibility will be reposed automatically in a party that assumes a discretionary role. Owing to the statute's definitional approach, it is legally possible that a party whose business touches on the disposition of plan assets, even if only a lending bank, could assume fiduciary status with respect to a plan and become liable for fiduciary breaches. Nonetheless, the discretionary role needed to support fiduciary status must amount to more than a theoretical contrivance. As one commentator has recently noted:
 
 
 55
 A secretary to a fiduciary may have discretion as to some mundane matters of plan management, but secretaries are not thereby made fiduciaries--not even limited ones. In principle, they could be, but experience and common sense suggests that a minimum level of discretion should be fixed, below which a person has no fiduciary responsibility at all.
 
 
 56
 Jay Conison, The Federal Common Law of ERISA Plan Attorneys, 41 Syracuse L.Rev. 1049, 1073 (1990). The issue with respect to Sun Bank is whether its powers as a secured commercial lender realistically gave rise to the discretionary control of the nature contemplated by ERISA.
 
 
 57
 At the outset, we must determine whether the terms of the loan agreement consummated in 1981 conferred fiduciary status on Sun Bank. Because the loan was secured by stock collateral, the loan necessarily conferred on the bank certain rights against the Plan that involved the disposition of Plan assets. For example, the bank was empowered to demand additional collateral. It was also empowered to liquidate the collateral pledged by the Plan and to compel the Plan to produce the S-15 registration (converting restricted shares to freely negotiable shares) that might be needed to effect the liquidation. While these rights indeed created an "authority" over the Plan assets that were pledged on the loan, they were remedies in the form of those commonly reserved to commercial lenders and were limited by a fixed framework--the statutory and common law, the loan's own terms, and the dictates of banking industry custom. The undisputed facts establish that the facially broad insecurity and liquidation provisions were typical of arm's length commercial loan agreements. As under ordinary debtor-creditor agreements, then, these powers were specifically limited.
 
 
 58
 An entity which assumes discretionary authority or control over plan assets will not be considered a fiduciary if that discretion is sufficiently limited by a pre-existing framework of policies, practices and procedures. See Munoz v. Prudential Ins. Co., 633 F.Supp. 564, 568 (D.Colo.1986) ("[I]t is a person's ability to make policy decisions outside of a pre-existing or separate framework of policies, practices and procedures which saddles that person with Erisa fiduciary liability."); see also Gelardi v. Pertec Computer Corp., 761 F.2d 1323, 1325 (9th Cir.1985) (per curiam) (holding that administrative actions within a framework of policies established by others do not constitute the exercise of fiduciary responsibility). Here, clear standards circumscribed Sun Bank's discretion with respect to the Plan. Florida's UCC good faith requirement, for example, limited the power of the bank to deem itself insecure. See Fla.Stat. § 671.203 (1990). The liquidation powers of the bank were also limited by clear standards, inasmuch as the promissory note provided that Sun Bank would be entitled to convert the preferred stock into common stock only in the event of the Plan's failure to make payments when due. The collateral pledged was deemed unsatisfactory only in accordance with the 70% margin call, which is commonly the objective standard used in commercial loans.[16] In light of this web of legal and contractual standards, we cannot hold that the conversion terms of the 1981 loan agreement conferred fiduciary status on Sun Bank.
 
 
 59
 Having rejected the loan documents as a textual source of fiduciary status, we must further address whether the bank's exercise of its rights and remedies triggered the attachment of fiduciary status. In the interest of consistency, we are reluctant to hold that the creation of legal rights in the bank failed to give rise to fiduciary status, but the exercise of those rights in conformity with the loan agreement did so nonetheless. In this case, the record shows that Sun Bank repeatedly found itself insecure due to the declining value of Air Florida stock, demanded additional collateral from the Plan, applied cash collateral and liquidated stock to reduce the outstanding balance, accepted a guaranty of the debt by the Plan sponsor, and ultimately satisfied the full balance by liquidating collateral after default on the already-renewed promissory note. At no point did Sun Bank's extraction of these remedies amount to management of the Plan itself. We cannot agree with appellant's claim that the bank's mere exercise of its contractual rights made the bank an alter ego of the named Plan fiduciaries. Although the bank's actions may have prompted the named fiduciaries to take steps detrimental to the Plan, Sun Bank is not equally responsible for this alleged mismanagement of the Plan assets.
 
 
 60
 To accept appellant's theory would subject any commercial lender acting within ordinary commercial custom to inconsistent obligations. On the one hand, a bank's duty to its own shareholders and depositors would demand that it enter into only those loan agreements which accord it sufficiently exacting security rights. On the other hand, a bank's resulting fiduciary duty to the plan-borrower would irreconcilably preclude its exercise of those crucial rights. Consistent with the fundamental purposes of ERISA, we decline appellant's invitation to impose a regime subjecting lenders to irreconcilable obligations and in so doing make it difficult or impossible for pension plans to persuade lenders to enter into arm's length, commercial loan transactions.
 
 
 61
 Our review of the case law ratifies our reluctance to confer fiduciary status on a bank merely because it legally converted plan assets held in its possession or exercised other ordinary powers under a lender-borrower relationship. Relevant cases have even rejected ERISA fiduciary status when the lender acted improperly or outside its legal rights. In O'Toole v. Arlington Trust Co., 681 F.2d 94 (1st Cir.1982), the court held that it lacked jurisdiction over an action against a bank in which pension funds were deposited because the bank was not a fiduciary within the meaning of ERISA. See id. at 96. Even though the bank in O'Toole had improperly converted assets of the plan by using deposited funds to offset debts of the plan sponsor, the court refused to hold
 
 
 62
 that the bank is a fiduciary within the meaning of the statute.... [The bank's] responsibilities as the depository for the funds do not include the discretionary, advisory activities described by the statute--activities which in fact were performed by [the trustees]. In the absence of these activities, it would be unfair to impose on [the bank] the responsibilities and liabilities created by the statute for fiduciaries.
 
 
 63
 Id.
 
 
 64
 Also instructive is Robbins v. First American Bank of Virginia, 514 F.Supp. 1183 (N.D.Ill.1981). There, the district court addressed the ERISA ramifications of a loan participation agreement between the defendant-bank and the trustees of an ERISA plan, whereby the plan offered 90% of the loan proceeds to a certain defendant-borrower. Dismissing an action brought against the bank after the borrower defaulted, the court held:
 
 
 65
 The bank was never itself involved with the administration or management of the fund itself or in making its investment policies and decisions.... The fixed terms of the loan [to the third party borrower] and commercial nature of the transaction belie the plaintiff's allegations of sufficient discretionary responsibility to come within the terms of the Act.
 
 
 66
 Id. at 1190-91; see also Brandt v. Grounds, 687 F.2d 895, 898 (7th Cir.1982) (holding that a bank is not a fiduciary liable for monies improperly converted by a trustee merely because it performed its depository function in the withdrawal transactions); American Sav. & Loan Ass'n/Home Sav. Ass'n, Dep't Labor Op. No. 79-10A, at 3-4, 6 (Feb. 12, 1979) (stating that a savings and loan association's depository relationship with an ERISA plan does not render the association a fiduciary under ERISA); Hibernia Bank v. International Bhd. of Teamsters, 411 F.Supp. 478, 488-90 (N.D.Cal.1976) (ruling that a bank cannot obtain fiduciary status by virtue of its agency and depository relationships with an ERISA plan). Neither the appellant nor this court can locate a case in which fiduciary status was conferred on a bank due to its ordinary commercial lending relationship with an ERISA plan.
 
 
 67
 Accordingly, we agree with the district court in holding that there is no issue as to any material fact in the record to preclude summary judgment as to Sun Bank's fiduciary liability.[17]
 
 
 68
 c. Greenberg, Traurig
 
 
 69
 Consistent with the functional definition of fiduciary status enshrined in ERISA, our determination concerning the fiduciary status of Greenberg, Traurig demands a functional examination of the law firm's conduct in connection with the Plan. Our inquiry, understood correctly, is not into the law firm's fiduciary duties under general laws applicable to the attorney-client relationship, but instead into fiduciary status within the precise meaning of ERISA. Accordingly, we focus on the firm's discretionary control or management, if any, over the Plan and its assets.
 
 
 70
 Department of Labor regulations provide elaborate guidance as to when an attorney or other consultant to a plan will be considered a fiduciary:
 
 
 71
 [W]hile attorneys, accountants, actuaries and consultants performing their usual professional functions will ordinarily not be considered fiduciaries, if the factual situation in a particular case falls within one of the categories described in clauses (a) through (d) ... such persons would be considered to be fiduciaries within the meaning of section 3(21) of the Act. [Clauses (a) through (d) provide:] a consultant (a) exercises discretionary authority or discretionary control respecting the management of the plan, (b) exercises authority or control respecting management or disposition of the plan's assets, (c) renders investment advice for a fee, direct or indirect, with respect to the assets of the plan, or has any authority or responsibility to do so, or (d) has any discretionary authority or discretionary responsibility in the administration of the plan.
 
 
 72
 29 C.F.R. § 2509.75-5 (1991). Applying these regulations, the court in Yaseta v. Baima, 837 F.2d 380 (9th Cir.1988), held that an attorney who "reviewed [an ERISA plan] and its compliance with the law" and did not control the plan "in a manner other than by usual professional functions" was not a fiduciary under ERISA. Id. at 385. Our review of the facts, likewise, is focused on departures by Greenberg, Traurig from usual professional functions.
 
 
 73
 The operative facts concern the extent to which Greenberg, Traurig acted outside the usual professional function of attorneys by (1) counseling the Plan as to the business or financial prudency of the June 1981 loan and acquisition of GALIC stock, (2) rendering investment advice with respect to those same transactions, and (3) rendering legal services in connection with the August 1982 redocumentation of the loan and uncompleted conversion of the Plan into an ESOP. In its brief, appellant paints a portrait of a law firm deeply penetrating the governance of the Plan, noting, for example, the firm's drafting of amendments to the Plan on its own initiative, the Plan's heightened reliance on the firm immediately following Timoner's stroke in 1982, the move of one of the firm's attorneys over to the Plan itself during 1982, and the hybrid business-legal character of much of the advice rendered through the relevant timespan. Even adopting all of the factual inferences relied on by appellant to project this portrait, we nevertheless find no basis in law to hold that Greenberg, Traurig departed from the usual functions of a law firm or otherwise effectively or realistically controlled the Plan.
 
 
 74
 We think it imprudent and counter to the thrust of the ERISA scheme to hold that the commingling of legal advice with incidental business observations, especially when this advice is proffered to businesspersons of some sophistication, will automatically confer fiduciary status on attorneys and thus expose them to ERISA liability. It cannot plausibly be considered consonant with the clear purpose of ERISA to deprive ERISA plans of access to ordinary legal advice, which not infrequently balances legal conclusions with some discussion of attendant business implications. Equally chilling would be a rule equating a law firm's advice in favor of a transaction with the named fiduciaries' actual decision to enter the transaction. Nevertheless, it is exactly this proposition that appellant advances in arguing that Greenberg, Traurig's advice in favor of a given course of action constituted effective control over the actions of the Plan.[18] In short, ERISA does not contemplate an allocation of liability that will deter consultants such as attorneys from assisting plans. Accordingly, we reject appellant's arguments to the effect that the law firm's attentiveness to business prudency or its occasional rendering of advice touching on an investment conferred fiduciary status on the law firm.[19]
 
 
 75
 Relevant cases support our reading of ERISA and the applicable regulations. The court in Nieto v. Ecker, 845 F.2d 868 (9th Cir.1988), held that an attorney who failed to collect delinquent employer contributions was not a fiduciary. Id. at 870-71. The Ninth Circuit persuasively articulated the fallacy of equating the performance of legal services with the exercise of fiduciary authority:
 
 
 76
 Plaintiffs contend ... that [the defendant-attorney] exercised such authority because the employer contributions he failed to collect were plan assets under his discretionary control.... This argument proves far too much. Under this rationale anyone performing services for an ERISA plan--be it an attorney, an accountant, a security guard or a janitor--would be rendered a fiduciary insofar as he exercised some control over trust assets....
 
 
 77
 Id. at 870. See also, Yaseta, 837 F.2d at 385; Anoka Orthopaedic Associates, P.A. v. Mutschler, 709 F.Supp. 1475, 1483 (D.Minn.1989) ("Applying [Department of Labor regulations pertaining to investment advice to the attorney's] activities, even if the Court assumes that he gave the investment advice ..., such rendering of advice would not cause him to become a fiduciary. [The attorney] neither had 'discretionary authority or control with respect to purchasing or selling securities' for the Plans, nor did he render advice 'on a regular basis.' " (citations omitted)), aff'd, 910 F.2d 514 (8th Cir.1990).
 
 
 78
 Finding that the undisputed facts support summary judgment on the issue of Greenberg, Traurig's fiduciary status, we affirm the grant of summary judgment below.
 
 4. Non-Fiduciary Liability Under ERISA
 
 79
 As an alternative to fiduciary liability, appellant argues that Sun Bank and Greenberg, Traurig are liable as non-fiduciaries who knowingly participated in a breach committed by an ERISA fiduciary.[20] This theory derives its framework from cases imposing liability where a non-fiduciary party commits an act or omission furthering or completing the breach of a fiduciary, and has actual or constructive knowledge that the act or omission constitutes a breach of trust.
 
 
 80
 The district court opinion in Freund v. Marshall & Ilsley Bank, 485 F.Supp. 629 (W.D.Wis.1979), was a progenitor of cases recognizing a cause of action against non-fiduciaries who conspire with an ERISA fiduciary. See id. at 641-42 ("[A court] is fully empowered to award the relief available in traditional trust law against non-fiduciaries who knowingly participate ... in a breach of trust."); accord Thornton v. Evans, 692 F.2d 1064, 1078 (7th Cir.1982). From the premise that Congress intended ERISA to federalize the common law of trusts with respect to employee benefit plans, the Freund court proceeded to extend the reach of ERISA to third parties who, under traditional trust law, could be held liable for assisting a trustee in a breach of trust. Freund, 485 F.Supp. at 642. Cases since have made reference to specific textual provisions of ERISA, asserting either that the equivalent of fiduciary liability (established in section 409(a)) reaches non-fiduciaries due to the incorporation of trust law into ERISA, see, e.g., Fremont v. McGraw-Edison Co., 606 F.2d 752, 758-59 (7th Cir.1979) (discussing liability of third parties pursuant to a section 409 claim), cert. denied, 445 U.S. 951, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980), or that section 502(a)(3)'s reference to "appropriate equitable relief" encompasses the award of monetary damages against non-fiduciaries. See, e.g., Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1220 (2d Cir.1987) (recognizing basis for recovery against non-fiduciaries under both trust law and section 502(a)(3)'s remedial provisions).
 
 
 81
 Since Freund and many of the opinions relying on its holding were decided, the Supreme Court has unambiguously intervened to restrain the grafting of novel remedies onto the statute. The Court's decision in Massachusetts Mutual Life Insurance Co. v. Russell, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), collided with the reasoning of these cases by instructing that " 'where a statute [such as ERISA] expressly provides a particular remedy or remedies, a court must be chary of reading others into it.' " Id. at 147, 105 S.Ct. at 3093 (quoting Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 19, 100 S.Ct. 242, 246-47, 62 L.Ed.2d 146 (1979)). Since Russell, the only circuit court decision to devote due attention to the Court's reasoning in that case has been Nieto v. Ecker, 845 F.2d 868 (9th Cir.1988), in which the Ninth Circuit rejected pre-Russell theories of non-fiduciary liability by holding that a non-fiduciary plan attorney could not be held liable for a fiduciary breach. See id. at 872-73. As a result of the circuits' selective attention to Russell, a split in authorities has arisen. Compare Nieto, 845 F.2d at 872-73 (rejecting non-fiduciary liability) with Pappas v. Buck Consultants, Inc., 923 F.2d 531, 541 (7th Cir.1991) (accepting non-fiduciary liability) and Brock v. Hendershott, 840 F.2d 339, 342 (6th Cir.1988) (same) and Lowen, 829 F.2d at 1220 (same) and Fink v. National Sav. and Trust Co., 772 F.2d 951, 958 (D.C.Cir.1985) (citing Freund in dicta for non-fiduciary liability principle). Carefully considering the rationales in these and other cases, we conclude that no cause of action exists under ERISA section 409(a) or 502(a)(3) for monetary damages against a non-fiduciary.
 
 
 82
 At the threshold of our inquiry, it is appropriate to search ERISA's text for any language plainly extending liability to non-fiduciaries. ERISA's monetary damages provision, section 409(a), by its own terms pertains only to fiduciaries. "The plain language of section 409(a) limits its coverage to fiduciaries, and nothing in the statute provides any support for holding others liable under that section." Nieto, 845 F.2d at 871. See also, Kevin B. Bogucki et al., Comment, Nieto v. Ecker: The Propriety of Non-Fiduciary Liability Under Section 409, 64 Notre Dame L.Rev. 271, 281 (1989). The question whether monetary damages are subsumed under the section 502(a)(3) concept of "equitable relief" is also plainly answered by the text of the statute, when considered as a coherent whole. We agree with the Nieto court's reminder that "[p]ermitting recovery of damages under section 502(a)(3) would render section 409(a) superfluous, a result contrary to a fundamental canon of statutory construction." Nieto, 845 F.2d at 873. Accordingly, we, like the Ninth Circuit, decline to so broadly interpret an isolated section of the statute as to render it inconsistent with the ERISA scheme as a whole.
 
 
 83
 Our accord with the holding in Nieto does not indicate a wholesale adoption of that decision's rationale. The most important reason for our departure from Nieto is that we now decide this question with the benefit of the Supreme Court's opinion in Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), in which Justice O'Connor explicitly authorized the development of a federal common law under ERISA drawing upon the traditional law of trusts. Citing the trust law principle whereby courts construe trust agreements without deference to the interpretation of either party, the Court held in Firestone that the fiduciary's termination of benefits to a participant was subject to de novo review. Laying the groundwork for the incorporation of this procedural rule into ERISA, the Court explained:
 
 
 84
 ERISA abounds with the language and terminology of trust law. ERISA's legislative history confirms that the Act's fiduciary responsibility provisions "codif[y] and mak[e] applicable to [ERISA] fiduciaries certain principles developed in the evolution of the law of trusts." Given this language and history, we have held that courts are to develop a "federal common law of rights and obligations under ERISA-regulated plans."
 
 
 85
 Id. at 110, 109 S.Ct. at 954 (quoting H.R.Rep. No. 533, 93rd Cong., 2d Sess. 11, reprinted in 1974 U.S.C.C.A.N. 4639, 4649; Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56, 107 S.Ct. 1549, 1558, 95 L.Ed.2d 39 (1987)) (other citations omitted).
 
 
 86
 The Nieto court proceeded without the benefit of the Firestone opinion and its invitation to the incorporation of procedural trust law principles; not surprisingly, then, Nieto emphasized the restrictive strains of the earlier Supreme Court opinion in Russell. In Russell, the Court addressed an action by a beneficiary for extracontractual damages who alleged that she had been damaged by a wrongful termination of payments, even after retroactive benefits were paid to her in full. Finding no express authority in the text of ERISA section 409 for extracontractual damages, as well as no indication of Congressional intent supporting an implied right of action for such relief, the Court was
 
 
 87
 reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA.... "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement."
 
 
 88
 Russell, 473 U.S. at 147, 105 S.Ct. at 3093 (quoting Northwest Airlines, Inc. v. Transport Workers, 451 U.S. 77, 97, 101 S.Ct. 1571, 1583, 67 L.Ed.2d 750 (1981)). The Nieto court acknowledged the legislative history supporting the application of certain trust law principles to fiduciaries as defined by ERISA, but, evidently emboldened by the teachings of Russell, declared that legislative history "does not support the broad[ ] proposition that ERISA meant to adopt the entire body of state trust law lock, stock, and barrel." Nieto, 845 F.2d at 872 n. 2. While we agree with the Nieto court's interpretation of ERISA's text, we strive in our analysis to better elaborate the lessons of both Russell and Firestone.
 
 
 89
 Accordingly, we interpret ERISA to embody a tailored law of trusts--a legal fabric which not only adopts familiar trust principles, but also supplements these principles with more exacting standards, and exempts from its reach certain parties and activities that may have been amenable to suit under traditional trust law. See Eaves v. Penn, 587 F.2d 453, 457 (10th Cir.1978). Thus, while it is obvious that ERISA is informed by trust law, the statute is, in its contours, meaningfully distinct from the body of the common law of trusts. A method of interpretation consonant with this realization will reject the unselective incorporation of trust law rules into ERISA. Rather, a court should only incorporate a given trust law principle if the statute's text negates an inference that the principle was omitted deliberately from the statute. ERISA is a "comprehensive and reticulated statute," Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980), bearing the marks of circumspect drafters; courts should proceed with commensurate circumspection before concluding that a prominent feature of trust law was omitted from the statute merely through inadvertence. As the Court taught in City of Milwaukee v. Illinois, 451 U.S. 304, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981):
 
 
 90
 The establishment of ... a self-consciously comprehensive program by Congress ... strongly suggests that there is no room for courts to attempt to improve on that program with federal common law.
 
 
 91
 Id. at 319, 101 S.Ct. at 1793.
 
 
 92
 A recent Second Circuit case, Chemung Canal Trust Co. v. Sovran Bank/Maryland, 939 F.2d 12 (2d Cir.1991), petition for cert. filed, 60 U.S.L.W. 3411 (U.S. Oct. 22, 1991) (No. 91-681), illustrates this approach in operation. There, the court recognized an unenumerated cause of action under ERISA for contribution or indemnity by a breaching fiduciary against a co-fiduciary. Notably, it did not automatically incorporate the indemnity rights recognized in the common law of trusts. Instead, its rationale focused specifically on what was contemplated by the statute's drafters:
 
 
 93
 Congress's failure to include enforcement provisions to address the relationships among fiduciaries does not necessarily mean that congress intended to preclude such remedies. ERISA was designed specifically to provide redress for plaintiffs--the plan's participants and beneficiaries. Its remedies do not purport to deal with allocating joint liabilities among fiduciaries....
 
 
 94
 Id. at 18 (citation omitted).
 
 
 95
 In the present case, appellant would have us ignore the obvious care with which ERISA's remedial provisions are formulated, instead requiring us to supplement the statute with a substantive right against a party that Congress readily could have chosen to reach. Congress clearly contemplated the involvement of non-fiduciary parties with employee benefit plans when it drafted provisions of ERISA. For example, ERISA sections 502(a)(3) and 502(a)(5) authorize suits to enjoin or obtain other equitable relief for "any act or practice " violating either the statute or the terms of a plan, without restricting the types of parties who may be so sued. 29 U.S.C. §§ 1132(a)(3), 1132(a)(5) (1988). ERISA section 3(14)(B), moreover, broadly defines the "parties in interest" with whom plans are prohibited to enter into certain transactions under section 406(a). 29 U.S.C. §§ 1002(14)(B), 1106(a) (1988). Significantly, however, Congress expressly limited the scope of sections 502(a)(3) and 502(a)(5) to equitable remedies, and likewise limited section 409(a) to provide a right of action only against fiduciaries. It is telling that, despite textual treatment of non-fiduciaries in various other parts of the ERISA scheme, provisions relevant to appellant's theory contain no textual support for a claim for monetary damages against non-fiduciaries. We cannot infer that Congress's silence is accidental in an area where Congress has already said so much out loud.
 
 
 96
 We recognize that federal courts may be authorized in certain areas to borrow procedural devices and principles from trust law. Nonetheless, we must conclude that, just as "[t]he six carefully integrated civil enforcement provisions found in § 502(a) of the statute ... provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly," Russell, 473 U.S. at 146, 105 S.Ct. at 3092 (emphasis in original), neither do relevant provisions imply a cause of action for monetary damages against a party excluded by--but clearly within the contemplation of--Congress at the time it formulated the ERISA scheme.
 
 
 97
 The district court correctly concluded that there is no cause of action for monetary damages under ERISA sections 409(a) or 502(a) for the participation of a non-fiduciary in a fiduciary breach. Therefore, its grant of summary judgment for Sun Bank and Greenberg, Traurig was appropriate.
 
 5. Regulation U
 
 98
 Appellant also asserts a private cause of action implied under Regulation U, 12 C.F.R. § 221 (1990). Regulation U, promulgated under section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g (1988), imposes credit restrictions on banks that issue loans secured by certain stock. In short, appellant alleges that Sun Bank violated Regulation U's "margin rules" by its method of valuing the stock pledged as collateral on the June 1981 loan.
 
 
 99
 On this theory, appellant clearly fails. Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), sets forth an analysis for determining the existence of an implied right of action under a federal statute. The Cort factors ask, inter alia, whether the plaintiff is a member of the class for whose benefit the statute was enacted, and whether there is any indication of congressional intent to provide the remedy sought. Id. at 78, 95 S.Ct. at 2088. Regulation U is clearly not targeted to serve the especial benefit of borrowers, as lenders and borrowers are equally culpable under the applicable regulations; significantly, Regulation X makes it a violation on the part of the borrower to accept credit in violation of the margin rules. See 12 C.F.R. § 224 (1990) (promulgated under 15 U.S.C. § 78g(f)).[21] This reciprocity of culpability also negates the Cort factor that looks to possible congressional intent to create the remedy sought by a private party. The clear intention is that both lender and borrower should simply conform their conduct to the margin rules, not sue one another for violations. In sum, there is no indication that Congress intended to create a private cause of action under Regulation U. See generally Bennett v. U.S. Trust Co., 770 F.2d 308, 313 (2d Cir.1985), ("[W]e agree with the unanimous view of the circuit courts [which] hold that there is no implied cause of action for violations of [Regulation U]"), cert. denied, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).
 
 
 100
 As the Regulation U theory fails legally, summary judgment for the appellees as to appellant's Regulation U-based cause of action is appropriate.
 
 6. Remaining Issues
 
 101
 Appellant argues on appeal that the district court abused its discretion in denying its ore tenus motion to amend its complaint to include a cause of action against Sun Bank as a non-fiduciary knowingly participating in a fiduciary breach. Because we have rejected this theory of liability, we need not address any abuse of discretion committed by the court in denying appellant's motion to add this claim to its complaint.
 
 
 102
 We also find it unnecessary to reach the issue of the availability to the Plan of extracontractual and punitive damages under ERISA section 409, 29 U.S.C. § 1109(a) (1988). Noting that the Supreme Court expressly left open the issue in Russell, 473 U.S. at 144 n. 12, 105 S.Ct. at 3091 n. 12, we defer consideration of this issue to a day when a plaintiff proceeding under section 409 has successfully asserted a theory of liability.
 
 III. CONCLUSION
 
 103
 Based on the foregoing, we hereby AFFIRM the order of the district court granting summary judgment in favor of defendants Sun Bank and Greenberg, Traurig.
 
 
 
 [1]
 The record discloses some dispute, however, as to exactly when Lloyd-Jones actually stepped into the position of Plan trustee that was left vacant by Timoner's stroke
 
 
 [2]
 These powers were embodied in two clauses of the agreement: an "additional collateral" clause, enabling the bank to require additional collateral when it deemed existing collateral to be unsatisfactory, and an "insecurity clause," giving the bank the power to declare a default when it deemed itself insecure
 
 
 [3]
 There is some dispute as to whether the 70% margin call trigger for Sun Bank's powers under the "insecurity clause" was the subject of an oral agreement between the parties, or rather was a banking convention that Sun Bank simply assumed to be in effect and later unilaterally imposed. For purposes of Useden's appeal from summary judgment in favor of the defendants, we must accept Useden's version--that the 70% margin call was unilaterally imposed by the bank. Bishop v. Wood, 426 U.S. 341, 347 & n. 11, 96 S.Ct. 2074, 2079 & n. 11, 48 L.Ed.2d 684 (1976)
 
 
 [4]
 See ERISA Section 406, 29 U.S.C. § 1106(a)(1)(B) (1988)
 
 
 [5]
 Under Rule 54(b), an order which fails to determine the rights and liabilities of all the parties to an action is not an appealable final order unless the district court determines that there is no just reason for delay according to 54(b) standards and directs entry of judgment
 
 
 [6]
 Rule 4(a)(1) provides in pertinent part:
 In a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal ... shall be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from....
 
 
 [7]
 The time for filing notice of appeal was subsequently tolled by Sun Bank's motion for reconsideration under Fed.R.Civ.P. 59(e). Appellant timely noticed appeal on May 11, 1990
 
 
 [8]
 Rule 60(b) provides in pertinent part:
 On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding....
 
 
 [9]
 Fed.R.Civ.P. 77(d) provides in pertinent part:
 Lack of notice of the entry [of a judgment or order] by the clerk does not affect the time to appeal or relieve or authorize the court to relieve a party for failure to appeal within the time allowed, except as permitted in Rule 4(a) of the Federal Rules of Appellate Procedure.
 
 
 [10]
 This intention to alter the certification was clearly within the realm of procedural possibility. Fed.R.Civ.P. 59(e) provides for motions to alter or amend a judgment within 10 days after entry of the judgment; a court may effect a sua sponte 59(e) motion within the same time period. See Burnam, 738 F.2d at 1232. A Rule 59(e) motion tolls the time for filing the notice of appeal
 
 
 [11]
 Fed.R.Civ.P. 6(b) provides:
 When by these rules or by a notice given thereunder or by order of court an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion ... upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect....
 
 
 [12]
 The ERISA claims in the present case do not entitle plaintiff to a jury trial. Calamia v. Spivey, 632 F.2d 1235, 1237 (5th Cir.1980)
 
 
 [13]
 The Nunez opinion illuminates this nuance by setting apart in a footnote the question of standards governing appellate review. Nunez, 572 F.2d at 1124 n. 6. The opinion therein cites cases in which courts reviewed issues that had been tried to juries, on the one hand, and to the court, on the other, and notes that the standard of review for each type of trial differs. Only in that footnoted passage does the Nunez court deal with the level of deference paid to the conclusions of the trial court on appeal. The main portion of the opinion, then, clearly addresses the propriety of granting summary judgment and does not disturb the settled principle that appellate courts review such dispositions de novo
 
 
 [14]
 Hiram Walker also involved an appeal from a summary judgment order issued by Judge Ryskamp. There, as here, parties on both sides had moved for summary judgment. The court of appeal noted in that case that Judge Ryskamp may have incorrectly assumed that no facts were in dispute merely because all parties had moved for summary judgment. The record in the present case discloses Judge Ryskamp's acknowledgment that contested issues of fact might yet remain, but also evidences an eagerness to dispense with the case at the summary judgment stage for the same reasons articulated in Nunez: "I think that every facet of this case has been fully explored and the court has been considerably enlightened as to the details of this entire transaction.... It is also apparent that this court would have to sit as the trier of fact to hear this case, and it is quite different when you hear a summary judgment knowing the case will go to a jury and when a case is going to be tried by the court." Transcript of Decision, December 16, 1988, R59-961-2. While the judge's willingness to draw inferences from the facts was consistent with Nunez, on appeal our review will be unaffected by any inferential conclusions reached below
 
 
 [15]
 The term "named fiduciary" is collaterally defined in ERISA Section 402(a)(2), 29 U.S.C. § 1102(a)(2) (1988), as a fiduciary named in the plan instrument
 
 
 [16]
 Useden's contention that the 70% margin call was not an initial part of the loan agreement is of no avail. The underlying custom provides some objective, if not absolute, limitation on the bank's powers. Coupled with the bank's ultimate adherence to this objective standard, this custom provides uncontroverted evidence that the bank's powers under the loan agreement were meaningfully limited and not later exceeded. A dispute as to a fact of insufficient probative value will not preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246-50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)
 
 
 [17]
 Appellant also asserts that Sun Bank was a fiduciary to the Plan by virtue of its preparation of Federal Reserve Form U-1 incident to the 1981 loan; a lender must complete Form U-1 pursuant to 12 C.F.R. § 221.3(b) (1990). (The form pertains to the valuation of stock collateral under Regulation U, 12 C.F.R. § 221 (1990).) This contention is without legal merit. Appellant relies on Northern Cal. Retail Clerks Union v. Jumbo Markets, Inc., 906 F.2d 1371 (9th Cir.1990), an irrelevant case holding that an employer must "faithfully and punctiliously" fill out reports on hours worked by employees when such reports are required by the terms of the employee pension plan. Id. at 1373. Form U-1 is neither related to the Plan at issue here nor relevant to ERISA. It is prepared for the benefit not of the borrower, but of the Federal Reserve Board. First Ala. Bancshares, Inc. v. Lowder, [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) p 98,015, at 91,252, 1981 WL 1638 (N.D.Ala. May 1, 1981)
 Appellant alleges that Sun Bank overvalued the collateral (i.e., restricted stock) reported on the form. Assuming, in appellant's favor, that this error was a breach of some duty owing to the borrower, the ministerial preparation of Form U-1 clearly does not confer fiduciary status needed to bring that breach within the proscription of ERISA. See 29 C.F.R. § 2509.75-5 (1991) (persons performing the ministerial duty of preparing reports required by government agencies are not fiduciaries). Regardless, the record is devoid of facts indicating that any erroneous entry on the form--even if Sun Bank's underlying overvaluation of the stock in some way harmed the Plan--can be causally linked to any damages suffered by the Plan. "[A] causal connection is required between the breach of fiduciary duty and the losses incurred by the plan." Brandt, 687 F.2d at 898.
 
 
 [18]
 In accordance with legislative history, we do not reject absolutely the proposition that consultants and advisors can, under some circumstances, assume fiduciary control
 While the ordinary functions of consultants and advisors to employee benefit plans (other than investment advisers) may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisers may because of their special expertise, in effect, be exercising discretionary authority or control with respect to the management or administration of such plan or some authority or control regarding its assets.
 H.R.Conf.Rep. No. 1280, 93rd Cong., 2d Sess. 32B, reprinted in 1974 U.S.C.C.A.N. 4639, 5038, 5103.
 Inquiring into the de facto control of a stock broker over an ERISA plan, the district court in Stanton v. Shearson Lehman/American Express, Inc., 631 F.Supp. 100 (N.D.Ga.1986) similarly suggested that the dominant expertise of the consultant may be relevant:
 Even though a client may have the final word on how his or her assets will be traded and is, thus, technically in control of the assets, it is the stock broker who is effectively and realistically in control of the assets when, for whatever reason, the client merely "rubber stamps"--follows automatically or without consideration--the investment recommendations of the broker.
 Id. at 103 (emphasis in original). This passage may somewhat overstate the principle sought to be adopted by the district court. It is significant, though, that the Stanton court was construing a regulation pertaining to stock brokers; that regulation is formulated so as to readily confer fiduciary status when the broker goes beyond acting on the clear instructions of the plan. See 29 C.F.R. § 2510.3-21(d) (1991). Any preference for such purely ministerial conduct would be misplaced in regard to the judgment-intensive services of legal counsel.
 
 
 [19]
 Investment advice must be rendered by one having "discretionary authority or control ... with respect to purchasing or selling securities" or be rendered on a "regular basis" in order to give rise to fiduciary status. 29 C.F.R. § 2510.3-21(c)(1) (1991)
 
 
 [20]
 Appellee omitted to include such a claim against Sun Bank in its complaint. On appeal, it asserts that the district court should have a permitted an amendment to include such a claim, and advances the legal theory against both appellees in its brief. For purposes of this discussion, we assume that the theory is properly argued against both Greenberg, Traurig and Sun Bank
 
 
 [21]
 Appellant's reliance on Congress's especial concern for employee retirement plans under ERISA, in connection with an implied cause under Regulation U, is simply mysterious