[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 98-3447

_____

D. C. Docket No. 97-2005-CIV-T-17E

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
07/14/99
THOMAS  K. KAHN
CLERK

UNITED STATES OF AMERICA,
GARY E. FLEWELLING, et al.,

                                                    Plaintiffs-Appellees,

versus

DBB, INC., G. S. CARE CORP., et al.,

                                                    Defendants-Appellants.

_____

No. 99-2058

_____

D. C. Docket No. 97-2005-CIV-T-17E

UNITED STATES OF AMERICA, STATE OF FLORIDA.,

                                                    Plaintiffs-Appellants,
                                                    Cross-Appellees,

versus

GOLD STAR MEDICAL SERVICES, INC.,
UNKNOWN COMPANY #1, et al.,

                                                    Defendants-Appellees,

BAY AREA MEDICAL PRODUCTS, INC.,
DELPHI SOLUTIONS, INC., et al.,

———————————————

Appeals from the United States District Court
for the Middle District of Florida

———————————————

**(July 14, 1999)**

Before COX and BIRCH, Circuit Judges and GODBOLD, Senior Circuit Judge.

COX, Circuit Judge:

The United States and various defendants separately appeal from a district court order granting a preliminary injunction pursuant to 18 U.S.C. § 1345(a)(2) freezing the defendants' assets that were traceable to their fraudulent activities. We consolidated the appeals, and for the reasons that follow, we affirm in part and vacate and remand in part.

## I.  Procedural History and Background

This action was originally filed by Gary E. Flewelling in August 1997 on behalf of the United States and the State of Florida pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, and Florida law.  Flewelling's complaint alleges that various defendants in the medical business  had engaged in a comprehensive scheme to defraud the Medicare and Medicaid programs.  In

2

September of 1998, the United States and the State of Florida ("the Government")

jointly intervened and assumed control of the litigation.

After its entry into the case, the Government filed an amended complaint that

named forty-six defendants. The complaint divides the defendants into three

categories: individual defendants, provider defendants, and laundering defendants.

The individual defendants are directors and officers of various companies that provide

Durable Medical Equipment ("DME") to Medicare/Medicaid beneficiaries or offer

services such as billing to DME providers. The complaint alleges that the individual

defendants are using the provider defendants to operate a scheme to defraud the

United States and the State of Florida through the submission of false or fraudulent

Medicare and Medicaid claims.[1] It further alleges that the individual defendants are

using the laundering defendants to divert the money obtained through this fraud to off-

shore accounts. The Government claims that the defendants have obtained more than

$7.2 million through their fraud. (R.1-21, Ex. 1 at 77-79.)

---

[1] Among other things, the alleged ongoing scheme to defraud involves: (1) providing kickbacks to medical and other personnel; (2) "upcoding," or charging for higher priced medical equipment than they actually delivered to beneficiaries; (3) failing to make legitimate attempts to collect the twenty percent (20%) Medicare co-payment for DME; (4) altering Certificates of Medical Necessity ("CMN") that had been signed by doctors; (5) completing CMNs by forging doctor signatures; and (6) using domestic and foreign bank accounts to launder the proceeds of the fraud. (R.1-21 at ¶ 103.)

The amended complaint seeks damages and civil penalties under the False Claims Act and injunctive relief under 18 U.S.C. § 1345 to prevent further dissipation of assets. It also includes a claim by the State of Florida for a violation of the Florida False Claims Act, Fla. Stat. §§ 68.081 to 68.092, and state law claims for unjust enrichment, payment by mistake of fact, and breach of contract.

After filing the amended complaint, the United States filed an *ex parte* motion pursuant to 18 U.S.C. § 1345(a)(2) seeking a temporary restraining order ("TRO") and a preliminary injunction. The United States offered evidence in support of its motion in the form of an affidavit of Special Agent Gregory Hendrickson of the Federal Bureau of Investigation. The district court granted the United States' motion for a TRO *ex parte* on September 8, 1998, and entered a TRO freezing all of the defendants' assets. It also entered an order indefinitely extending the duration of the TRO until a ruling was entered on the motion for a preliminary injunction.

The amended complaint and motion for a preliminary injunction were then served on the defendants. The district court referred the case to a magistrate judge to consider the United States' motion for a preliminary injunction. After a hearing, the magistrate judge issued a report and recommendation concluding that the United States had established a reasonable probability that the defendants were disposing of fraudulently-obtained funds. The magistrate judge therefore recommended that a

preliminary injunction be issued pursuant to § 1345(a)(2)(A) to freeze the defendants' assets that were traceable to the alleged fraud.

The district court adopted the magistrate judge's report and recommendation, and a preliminary injunction was entered on December 10, 1998. The district court provided the United States 30 days to file a memorandum indicating the defendants' assets that were traceable to the alleged fraud. The United States filed a motion to amend the injunction to freeze assets equivalent in value to the amount obtained by the defendants through fraud whether traceable to the fraud or not. The district court denied the motion. It concluded that the plain language of the statute required the United States to trace to the fraud any assets that it wished to freeze through a preliminary injunction.

Both the United States and various defendants filed notices of appeal from the district court rulings. Defendants Goldstar Healthcare, Inc., DBB, Inc., G.S. Care Corp., Trans-Capital Investment Group, Inc., Fulcrum Services, Inc., Birotech Corp., Douglas Haught II, Peggy L. Haught, Brian Haught, and Robert Haught ("the Haught Defendants") jointly filed a notice of appeal challenging the district court's indefinite extension of the TRO. They later amended their appeal to include challenges to the preliminary injunction. The United States appealed the district court's decision to limit

5

the injunction to the freezing of assets traceable to fraud.[2]  Finally, Defendants

Madden Delphi Solutions, Inc. and Universal Medical, Inc. cross-appealed, raising

several challenges to the district court's entry of the preliminary injunction.  On

January 8, 1999, we consolidated the Haught Defendants' appeal with the United

States' appeal.

---

[2]      The United States also filed a motion asking this court for an emergency
injunction to prevent the defendants, pending appeal, from disposing of the assets frozen by
operation of the TRO.  We granted the motion.

## II. Issues on Appeal and Contentions of the Parties

Although the parties raise numerous issues in their briefs, only one of them warrants discussion.[3] The United States argues on appeal that the district court erred in concluding that § 1345(a)(2)(B) does not authorize the issuance of an injunction to freeze property equal in value to the amount a defendant obtains through fraud. The statutory section at issue in this case reads as follows:

> (a)(2) If a person is alienating or disposing of property, or intends to alienate or dispose of property, obtained as a result of a [Federal health care offense] or property which is traceable to such violation, the Attorney General may commence a civil action in any Federal court–
>
> (A)    to enjoin such alienation or disposition of property; or
> (B)    for a *restraining order* to–
>    (i)    prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such property or property of equivalent value; and
>    (ii)    appoint a temporary receiver to administer such restraining order.

18 U.S.C. § 1345(a)(2) (emphasis added). Both parties agree that subsection (a)(2)(A) authorizes injunctions to freeze property obtained through fraud or traceable to fraud and that subsection (a)(2)(B) authorizes TROs that freeze property of equivalent

---

[3]    The Defendants argue in their appeals and cross-appeals that the district court erred in: (1) maintaining the blanket asset freeze contained in the TRO beyond the 20 day limit imposed by Rule 65 of the Federal Rules of Civil Procedure; (2) considering an "Estimated Overpayment Chart" as evidence in granting the Government a preliminary injunction; (3) shifting a portion of the burden to the defendants to determine the eventual scope of the injunction; and (4) including insufficient factual findings in its order granting injunctive relief. We find no merit in these arguments and reject them without discussion. *See* 11th Cir. R. 36-1.

value. Their disagreement arises over whether subsection (a)(2)(B), which may reach "property of equivalent value" whether or not it is traceable to fraud, also authorizes the court to grant injunctions. The United States contends that it does because the phrase "restraining order" in subsection (a)(2)(B) refers in a general sense to any injunctive relief, including preliminary injunctions. The defendants respond that the plain meaning of the term "restraining order" as it is used in the subsection refers only to TROs.

The issue that we must decide, therefore, is whether the term "restraining order" in subsection (a)(2)(B) authorizes a district court to grant any injunctive relief to freeze assets of equivalent value or whether it only authorizes the issuance of temporary restraining orders. This is an issue of statutory interpretation that we review *de novo*. *United States v. Veal*, 153 F.3d 1233, 1245 (11th Cir. 1999).

## III. Discussion

*A. Introduction*

The United States bases its argument upon three grounds. First, it argues that the plain language of the statute supports a broad reading of the term "restraining order." Second, it argues that its interpretation of the statute is consistent with congressional intent and that any other reading would frustrate that intent and lead to absurd results. Finally, it contends that the identical term was interpreted broadly in

8

a statutory section included in the same act and that both terms should be construed consistently. Defendants argue that the plain language supports their reading of the statute and that any other interpretation would make subsection (a)(2)(A) superfluous. We will address each of these contentions in turn.

There are several canons of statutory construction that guide our interpretation of the statute. The starting point for all statutory interpretation is the language of the statute itself. *See, e.g., Watt v. Alaska*, 451 U.S. 259, 265, 101 S. Ct. 1673, 1677 (1981). We assume that Congress used the words in a statute as they are commonly and ordinarily understood, and we read the statute to give full effect to each of its provisions. *United States v. McLymont*, 45 F.3d 400, 401 (11th Cir. 1995) (per curiam). We do not look at one word or term in isolation, but instead we look to the entire statutory context. *United States v. McLemore,* 28 F.3d 1160, 1162 (11th Cir. 1994) (citation omitted). We will only look beyond the plain language of a statute at extrinsic materials to determine the congressional intent if: (1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent. *See Consolidated Bank, N.A. v. Dep. of Treasury*, 118 F.3d 1461, 1463-64 (11th Cir. 1997) (citations omitted).

## B.  Plain Language of the Statute

Applying these principles, we turn first to the statutory language at issue in this case.  On its face, the statute authorizes the issuance of a "restraining order" to freeze property obtained through fraud, property traceable to fraud, or property of equivalent value.  *See* § 1345(a)(2)(B).  The United States argues that the absence of the word "temporary" prior to the term "restraining order" indicates that Congress meant to use the term in a general sense to mean any form of injunctive relief.  Defendants, relying in part on the definition in Black's Law Dictionary, argue that the term "restraining order" means only a TRO.[4]  As a result, they contend, Congress's failure to insert the word "temporary" into the statute is meaningless.

The term "restraining order" is often used to refer to temporary restraining orders within the meaning of Rule 65 of the Federal Rules of Civil Procedure.  Indeed, the definition in Black's Law Dictionary arguably supports the defendants' narrow reading of the statute.  There are several factors, however, that compel us to conclude that the term as it is used in this statute is ambiguous.  First, the term "restraining

---

[4]     The definition relied upon by the defendants defines a restraining order as: [a]n order which may issue upon filing of an application for an injunction forbidding the defendant to do the threatened act until a hearing on the application can be had, and is distinguishable from an injunction, in that the former is intended only as a restraint until the propriety of granting an injunction can be determined and it does no more than restrain the proceedings until such determination.
Blacks Law Dictionary 1314 (Sixth ed. 1990).

10

order" is not always used in such a restricted manner, and it may be read to mean all forms of injunctive relief. The definition in Webster's Third New International Dictionary, for example, is "a preliminary legal order sometimes issued to keep a situation unchanged pending decision upon an application for an injunction." Webster's Third New International Dictionary 1937 (1981). This definition is broad enough to include both temporary restraining orders and preliminary injunctions as those terms are used in the Federal Rules of Civil Procedure since both serve to maintain the status quo until a final decision on a matter can be reached. *See* Fed. R. Civ. P. 65.[5] Second, the text of the statute does not contain the limiting word "temporary" in front of the term even though Congress has used the phrase "temporary restraining order" in other sections of Title 18. *See, e.g.,* 18 U.S.C. § 1963(d)(2); 18 U.S.C. § 2253(c)(2). In light of these conflicting meanings of the term and the fact that Congress has not always used terminology consistent with that used

---

[5] A Rule 65 TRO often functions to preserve the status quo until a court can enter a decision on a preliminary injunction application, while a Rule 65 preliminary injunction is often used to maintain the status quo until a court can enter a final decision granting a permanent injunction or some other final relief.

in Rule 65, the language of the statute does not clearly answer our question.[6]  As a result, we must look beyond the text and determine the legislative intent.[7]

*C. Legislative History*

The legislative history is sparse.  The original version of § 1345 was enacted in 1984 as part of the Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, § 1205(a), 98 Stat. 1837, 2152 (1984).  It was then substantially amended, and subsection (a)(2) was added to the statute in November 1990 as part of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990, Title XXV of the Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4859 (1990).  Title XXV was entitled "Banking Law Enforcement" and its subtitle B, which included section 1345(a)(2), was entitled "Protecting Assets from Wrongful Disposition."  The Act was passed in the wake of well-publicized problems in the savings and loan industry.  The purpose of Title XXV was "to enhance the enforcement powers of the Department of Justice and the Federal financial institution regulatory agencies with respect to unlawful activities affecting federally insured

---

[6]     Besides referring to "restraining orders" in the clause at issue in this case, Congress referred to "temporary injunctions" in other sections of the statute.  *See* 18 U.S.C. § 1345(a)(3).   That term is not contained in Rule 65 of the Federal Rules of Civil Procedure.

[7]     We recognize that the Fourth Circuit in *United States v. Cohen*, 152 F.3d 321, 324 n.4 (4th Cir. 1998), stated in a footnote, without any analysis, that "subsection (a)(2)(A) refers to injunctions whereas subsection (a)(2)(B) refers to restraining orders."  This conclusion appears to be based on the text of the statute.  To the extent that it suggests that the language of the statute is clear and unambiguous, we disagree.

12

financial institutions." 136 Cong. Rec. E3684 (Nov. 2, 1990) (extension of remarks of Rep. Schumer). Section 1345(a)(2), as originally enacted, only applied to banking fraud. Congress amended the section in 1996 to make it applicable to health care fraud as well. *See* Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, § 247, 110 Stat. 1936, 2018 (1996).

Regarding the authorization of prejudgment attachments, the legislative history indicates that Congress intended to enhance the government's ability to enjoin the dissipation of assets wrongfully obtained through fraud. *See* 136 Cong. Rec. E3684 (Nov. 2, 1990); 136 Cong. Rec. H13288, H13293 (Oct. 27, 1990) (Statement of Rep. Fish) (the Title "strengthens the banking enforcement agencies' ability to recover funds from the S&L wrong-doers."); 136 Cong. Rec. H13288, H13296 (Oct. 27, 1990) (Statement of Rep. Schumer) ("We provide for prejudgment attachment and set freezes. You do not want the savings and loan crooks to abscound and escape with their money. This bill will stop it."). When interpreting an ambiguous statute, a court should "consider the purpose, the subject matter and the condition of affairs which led to its enactment, and so construe it as to effectuate and not destroy the spirit and force of the law and not to render it absurd." *Lambur v. Yates*, 148 F.2d 137, 139 (8th Cir.

1945)(citations omitted).  The only plausible construction that gives effect to the

Congressional intent is the construction of the statute urged by the United States.[8]

Defendants' interpretation would frustrate the congressional intent and lead to

absurd results for several reasons.  They argue that subsection (a)(2)(A), which

---

[8]    The legislative history indicates that the final version of Title XXV grew out of several bills that were passed by the House and Senate, including: (1) S. 1970, an omnibus crime bill passed by the Senate on July 11, 1990; (2) H.R. 5401, the Banking Law Enforcement Act of 1990 which passed the House on July 31, 1990; and (3) H.R. 5269, the Comprehensive Crime Control Act of 1990, which was passed by the House on October 5, 1990 and which contained a title dealing with bank law enforcement that was based on an amendment offered by Rep. Schumer.  *See* 136 Cong. Rec. E3684 (Nov. 2, 1990) (extension of remarks of Rep. Schumer).

The draft version of § 1345 that was passed by the Senate in S.1970 read, in relevant part, as follows:

> . . . the Attorney General may initiate a civil proceeding in a district court of the United States *to enjoin the violation or alienation or disposition of property or assets of equivalent value.*  In any such case, the Attorney General may petition for a restraining order to prohibit any person from withdrawing, transferring, removing, dissipating, or disposing of any such funds, assets, or other property and to appoint a temporary receiver to administer such restraining order.

136 Cong. Rec. S10184, S10246 (July 11, 1990) (emphasis added).  This language can only be interpreted as authoring a preliminary injunction that would freeze assets of equivalent value of the property obtained through fraud.

H.R. 5401 and H.R. 5269 both contained the language that was ultimately enacted in the final statute.  *See*136 Cong. Rec. H5995, H5996 (July 31, 1990) (H.R. 5401);136 Cong. Rec. H8758, H8778 (Oct. 5, 1990) (H.R. 5269).  This language differed from S.1970.  The fact that the language in S.1970 existed and was not adopted does not alter our interpretation of the statute because the legislative history is silent as to why this language was not adopted. Congress could have decided that the form of § 1345 actually enacted had the same meaning as the Senate draft version.  *See* 136 Cong. Rec. H5431, H5433 (July 24, 1990) (introducing Schumer Amendment to H.R. 5269 and describing it as authorizing under § 1345 "an order enjoining such violation or restraining any person from disposing of the property, or property of equivalent value.  The court can also appoint a temporary receiver to administer the restraining order."); *see also* 136 Cong. Rec. H5995, H6016 (July 31, 1990) (stating that H.R. 5401 allows for ". . . prejudgment attachment of the crooks' assets.  Many of the wrongdoers transfer and hide their assets when they think that the Federal Government is closing in.  The bill will allow the Government to have the assets seized by the court pending the outcome of the trial for damages.").

authorizes enjoining the alienation or disposition of property obtained as a result of health care fraud or property traceable to such fraud, includes all forms of injunctive relief, but that subsection (a)(2)(B), which also permits freezing "property of equivalent value" to that obtained by fraud, includes only TROs. Under this interpretation, if a defendant is alienating or disposing of property obtained by fraud (or intends to do so), the government may obtain a TRO to freeze "property of equivalent value." But under Fed. R. Civ. P. 65(b) this TRO generally will expire in no more than 10 or 20 days, after which the defendant would be free to transfer the "property of equivalent value" which had been frozen unless by then the government could trace the property to health care fraud. Given the realities and practicalities of litigation, such a TRO would be of dubious value to the government. Congress could not have intended such a result unless it thought that 10 or 20 days would suffice to enable the government to establish that the "property of equivalent value" frozen by the TRO was traceable to the fraud in question and to obtain a preliminary injunction. Common sense requires that we reject the idea that Congress entertained any such notion.

Furthermore, we note that subsection (a)(2)(B)(ii) authorizes the court to appoint a temporary receiver to administer the frozen assets. If the "restraining order" language in § 1345(a)(2)(B) only authorizes a court to grant a TRO, the provision

15

allowing for the appointment of a temporary receiver would have little purpose. It does not seem practical for a district court to find and appoint a receiver for such a short period of time.

In contrast, under the United States' interpretation of the statute, the Attorney General would have broad power to freeze assets and prevent the dissipation of them prior to a final judgment. The Attorney General could obtain an *ex parte* TRO upon the filing of the complaint to freeze assets of equivalent value until a hearing on a motion for a preliminary injunction could be held. At the hearing, the United States could obtain an injunction freezing assets of equivalent value and secure the appointment of a temporary receiver to administer the assets pending a final decision in the case. This construction of the statute would preserve the defendant's assets until a judgment requiring restitution or forfeiture could be obtained.

*D. Context of Enactment and Interpretation of Similar Terms*

The context in which § 1345(a)(2) was enacted also provides support for the United States' interpretation of the statute. As discussed above, § 1345(a)(2) was enacted in 1990 as part of the Comprehensive Thrift and Bank Fraud Prosecution and Taxpayer Recovery Act of 1990, Title XXV of the Crime Control Act of 1990, Pub. L. No. 101-647, 104 Stat. 4859 (1990). As originally enacted, subtitle B of Title XXV of this Act contained two similarly-worded provisions. Section 2521(b)(2),

16

which is now codified at 18 U.S.C. § 1345(a)(2), authorized the Attorney General to obtain injunctive relief to freeze assets in certain circumstances. Section 2521(b)(1), which is now codified at 12 U.S.C. § 1818(i)(4), authorized federal banking agencies to obtain injunctive relief to freeze assets. When enacted in 1990, this latter statutory section provided in relevant part that:

> (A) In general–In any action brought by an appropriate Federal banking agency . . . pursuant to this section . . . the court may, upon application of the agency, issue a *restraining order* that–
>
> (i)     prohibits any person subject to the proceeding from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets or other property; and
>
> (ii)    appoints a temporary receiver to administer the restraining order.
>
> (B) Standard.–*A permanent or temporary injunction or restraining order* shall be granted without bond upon a prima facie showing that money damages, restitution, or civil money penalties, as sought by such agency, is appropriate.

12 U.S.C. § 1818(i)(4) (1991) (emphasis added).[9]   Although this section only provides that a district court may enter a "restraining order," the standard applicable to the granting of the restraining order provides that "a permanent or temporary injunction or restraining order" shall be issued when a certain showing is made. This language suggests that the term "restraining order" in section 2521(b)(1) was used

---

[9]      This section was amended effective December 1993 to replace subsection B with a new subsection. *See* Pub. L. 103-204; 12 U.S.C. § 1818(i)(4)(B) (1994). This change does not affect our analysis.

17

broadly and in a generic sense to include both preliminary injunctions and temporary restraining orders.

In accordance with this broad reading, courts have treated 12 U.S.C. § 1818(i)(4) as authorizing the issuance of preliminary injunctions. *See Director of the Office of Thrift Supervision, U.S. Department of Treasury v. Lopez*, 960 F.2d 958 (11th Cir. 1992) (reversing and remanding a district court order denying a preliminary injunction under § 1818(i)(4)); *see also Board of Governors v. DLG Financial Corp.*, 29 F.3d 993 (5th Cir. 1994) (affirming district court preliminary injunction issued under § 1818(i)(4)). Since the statutes now codified at 12 U.S.C. § 1818(i)(4) and 18 U.S.C. § 1345(a)(2)(B) were enacted as part of the same Bank Fraud Act with the same purposes, the identical terms contained in each should be construed to have the same meaning. *See Sorenson v. Sec. of Treasury*, 475 U.S. 858, 860, 106 S. Ct. 1600, 1606 (1986) (stating canon of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning" (citation and internal quotation marks omitted)). Defendants argue that Title 12 is a civil code section while Title 18 is a criminal code section. As a result, they argue, the meaning of the term "restraining order" in each code section should be interpreted differently. There is no basis for this distinction, however, as § 1345(a)(2)(B) is clearly civil in nature. *See* 18 U.S.C. § 1345(a)(2) ("the Attorney General may commence a civil

18

action in any Federal court. . . .").  Furthermore, although they were assigned to different sections of the United States Code, both statutory sections were enacted as part of the same congressional act and both were passed with the intent to strengthen the government's ability to prevent the dissipation of wrongfully obtained property.

   *E.    A Final Caveat:  Avoiding Superfluous Terms*

   Based on all the factors that we have discussed, we conclude that Congress used the phrase "restraining order" in its general sense to mean all forms of injunctive relief.  We must, however, address one final argument raised by the defendants.  They contend that our interpretation of the phrase "restraining order" would make both § 1345(a)(2)'s introduction paragraph and subsection (a)(2)(A) superfluous.  First, they assert that if subsection (a)(2)(B) is read to authorize preliminary injunctions, then there would be no need to have the language in subsection (a)(2) defining the types of covered assets because the "equivalent value" language in subsection (a)(2)(B) would engulf the other types of property.  Second, they contend that if subsection (a)(2)(B) is read to authorize preliminary injunctions, then there would be no need to have subsection (a)(2)(A) also authorizing preliminary injunctions.

   It is true that "courts should disfavor interpretations of statutes that render language superfluous."  *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253, 112 S. Ct. 1146, 1149 (1992).  A statute should be "interpreted so that no words shall be

discarded as meaningless, redundant, or mere surplusage." *See United States v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir. 1991). We do not believe, however, that our interpretation renders § 1345(a)(2)'s introductory paragraph or subsection (a)(2)(A) unnecessary parts of the statute.

Under the construction of the statute that we adopt today, the introductory paragraph in § 1345(a)(2)'s list of the covered property remains a necessary part of the statute because it defines the requisite showing that the United States must make to receive any of the injunctive relief authorized under subsections (a)(2)(A) and (a)(2)(B). In order to obtain relief, the United States must show that a defendant is alienating or disposing of property obtained through, or traceable to, health care fraud. Furthermore, under our interpretation, the two subsections provide broad avenues of relief that complement each other and further congressional intent. Subsection (a)(2)(A) offers the government the ability to prevent the sale or other disposition of a particular piece of property that it has traced to fraud. Subsection (a)(2)(B), on the other hand, explicitly provides broader relief for situations where the property obtained through fraud is not as easily identified. It allows the government to prevent the withdrawing, transferring, removing, and dissipating of an amount of the defendant's assets equal to that obtained through fraud and to have a temporary receiver appointed to administer the assets until a final judgment is reached. In

addition, the use of the phrase "any person" in subsection (a)(2)(B) appears to also authorize injunctions that prevent third parties from removing a defendant's assets. We do not have to decide in this case why Congress provided for these overlapping remedies; we only have to note that our reading of the statute does not read (a)(2)(A) out of the statute.

## IV. Conclusion

For all of these reasons, we conclude that the term "restraining order," as it is used in 18 U.S.C. § 1345(a)(2)(B), is used in the general sense to mean any form of injunctive relief and is not limited to "temporary restraining orders." As a result, the decision of the district court that section 1345(a)(2)(B) did not apply to preliminary injunctions is reversed and the matter is remanded for proceedings consistent with this opinion. The district court's orders are affirmed in all other respects.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.