Samuel D. MOORE, Curtis Mayfield, et al., Plaintiffs-Appellants,

v.

AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS, AFTRA Health and
Retirement Fund, et al., Defendants-Appellees.

Nos. 98-8895, 98-9263.

United States Court of Appeals,

Eleventh Circuit.

June 29, 2000.

Appeals from the United States District Court for the Northern District of Georgia. (No. 98-02358-1-CV-CC),
Clarence Cooper, Judge.

Before ANDERSON, Chief Judge, and TJOFLAT and FAY, Circuit Judges.

TJOFLAT, Circuit Judge:

Plaintiffs, eighteen recording artists, brought this suit against their union's benefit plans, AFTRA

Health and Retirement Funds (the "Funds"); the trustees of the Funds ("Funds Trustees"); and eight record

companies (the "Record Company Defendants") who contribute to the Funds on plaintiffs' behalf. Plaintiffs'

complaint contains eight counts, each purporting to allege a separate cause of action.[1] Albeit under separate

theories of recovery, all eight counts allege that the Record Company Defendants, with whom the plaintiffs

have recording contracts, improperly interpreted the provision of the union's collective bargaining agreement

with the record companies which determines the amount the companies should contribute to the Funds on the

plaintiffs' behalf, and therefore failed to contribute the amounts due. The eight counts also allege that the

Funds Trustees breached their fiduciary duty by failing to collect the delinquencies.

After filing suit, the plaintiffs moved the district court to certify a class of recording artists for the

purpose of litigating three breach of fiduciary duty claims against the Funds Trustees, and a civil RICO claim

---

[1]As we set out *infra,* the plaintiffs filed a complaint and two amended complaints. The second amended
complaint contains nine counts, which we treat as eight counts because one, Count IV, does not state a cause
of action. Rather, it merely seeks equitable relief for unspecified violations of law, labeled "statutory
violations," by the Record Company Defendants. Six of the counts of the second amended complaint are
implicated in these appeals.

against the Record Company Defendants. The district court denied the plaintiffs' motion. In its order, the court certified a question of law for appeal under 28 U.S.C. § 1292(b) (1994), and we granted the plaintiffs leave to appeal the order, Appeal No. 98-9265. Appeal No. 98-8895, which is from a final judgment entered pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, presents the question whether the district court properly dismissed two claims against the Record Company Defendants: a derivative delinquent contribution claim under the Employee Retirement Income Security Act of 1974 ("ERISA") section 509(g)(2) (codified at 29 U.S.C. § 1132(g)(2) (1994)), and a claim for equitable relief under ERISA section 509(a)(3) (codified at 29 U.S.C. § 1132(a)(3)). We find no abuse of discretion in the district court's denial of class certification and no error in the court's dismissal of these ERISA claims, and accordingly affirm.

## I.

## A.

Plaintiffs and the class they seek to represent are recording artists; all of them are singers.[2] Through agents, they negotiate and enter into individual contracts with record companies, including the Record Company Defendants, relating to the creation, promotion, and sale of record albums. The plaintiffs are compensated with royalties; the record companies receive the profits from the sale of the albums.

The American Federation of Television and Radio Artists ("AFTRA"), a union, represents the singers (and thus the plaintiffs) and several other categories of entertainers, such as actors and musicians. At all times material to this suit, a collective bargaining agreement for the benefit of the singers has existed between AFTRA and the record companies (including the Record Company Defendants). This agreement is called "Phono Code."

---

[2]The plaintiffs in this case include a number of inductees into the Rock & Roll Hall of Fame in Cleveland, Ohio, such as: Samuel Moore, one half of the singing duo Sam and Dave; Curtis Mayfield, famous for his work on the soundtrack to the motion picture "Superfly"; Brian Hyland, who had his first success in 1960 with the song "Itsy Bitsy Teenie Weenie Yellow Polka Dot Bikini"; and Carl Garder, lead singer of the 1950s doo-wop group The Coasters.

The Phono Code originated in the mid-1950s. In 1959, AFTRA and the record companies (and other entities not pertinent here) entered into an Agreement and Declaration of Trust ("the Trust Agreement") in order to provide fringe benefits for singers (and other artists AFTRA represents). The agreement created two funds, a health fund and a retirement fund ("the Funds"), and twenty trusteeships, the Funds Trustees. Ten of the trustee positions are held by individuals chosen by the record companies, and ten are held by individuals chosen by AFTRA.[3] Contemporaneously with the enactment of the Trust Agreement, AFTRA and the record companies amended the Phono Code in order to provide underwriting for the singers' benefits; the amendment incorporated by reference the Trust Agreement and obligated the record companies to contribute to the Funds five percent of the "gross compensation" the companies paid to the singers. Through amendments, that percentage has become eleven percent.

Under the Trust Agreement, the Funds Trustees have "full authority to determine the form, nature, and amount of benefits" to be paid to the singers, and are "authorized and empowered to ... compromise, settle, arbitrate and release claims or demands in favor or against" the Funds and to "construe the provisions of the Trust Agreement." Any construction of the agreement the Funds Trustees render "in good faith" is "binding" on AFTRA and the record companies.

The Phono Code requires a record company to send the Funds and each singer with whom it has contracted a semi-annual statement of the "gross compensation" the company has paid the singer during the previous six months.[4] The central issue in these appeals (and in the counts of the complaint not before us)

---

[3]Only one of the ten record company trustees named as defendants, Norman Samnick, is associated with the record companies that are defendants in this action. The others were selected by companies not involved in the present action.

[4]For example, if the singer has earned $100,000 in royalties, and the percentage the record company is required to contribute to the Funds is eleven percent, the statement would reflect that the singer has earned $100,000 and the company has paid (or will pay) the Funds $11,000.

is the meaning of the term "gross compensation."[5]  In 1959, when the Trust Agreement was created and the Phono Code was amended to incorporate its terms, a singer's "gross" compensation amounted to the royalty payments he received from his record company for the albums it sold.  Since the parties' recording contract obligated the company to underwrite all of the costs of producing and selling an album,[6] it deducted nothing from the royalties;  hence, there was no such thing as "net" compensation.  Over time, however, the record companies shifted the costs of producing and selling albums to the artists, such that by the 1970s the singers had assumed the lion's share of these costs.[7]  Not infrequently, a contract between a record company and a singer called for the company to front certain costs.  The singer would reimburse the company from royalties, in which case, the company's semi-annual statement to the singer and the Funds would reflect as "gross" compensation the "net" compensation actually paid to the singer—after deducting the costs the company had fronted.  The result of this arrangement was that the term "gross compensation" in the Phono Code became ambiguous.  The record companies took the position that the term did not include the expenses it fronted for the singer;  the Funds Trustees, once the ambiguity was called to their attention, disagreed;  gross compensation included such expenses.  Which interpretation of gross compensation is correct would depend on what AFTRA and the record companies intended the phrase to mean when the phrase first appeared in an amendment to the Phono Code. Nothing in the record, however, indicates what AFTRA and the record companies had in their minds and said to one another when they adopted the phrase "gross compensation."

---

[5]The term "gross compensation" appears in the collective bargaining agreement.  It does not appear in the Trust Agreement.  The Trust Agreement states that record companies will contribute "the amount required by the collective bargaining agreements ..., [and] the rate and amount shall at all times be governed by said collective bargaining agreements."

[6]These production costs included "studio time," the wages paid to accompanying musicians, and advertising and distribution expenses.

[7]The record before us does not indicate precisely when this occurred;  all that the record discloses is that the parties spotted the ambiguity discussed in the text *infra* in the 1970s.

**4**

In any event, as early as the 1970s, the record companies and the Funds Trustees attempted to resolve this problem through negotiations. Their efforts failed, and the record companies adhered to their interpretation of "gross compensation." The Funds Trustees and AFTRA acceded to the record companies' interpretation rather than seeking a judicial declaration that gross compensation included the monies the companies fronted the singers and deducted from their royalties.[8] In 1995, AFTRA and the record companies eliminated the problem when they renegotiated the Phono Code and defined the phrase "gross compensation."[9]

B.

The plaintiffs brought the instant action in 1993, prior to the Phono Code amendment defining gross compensation. In their complaint, they sought to recover (for the benefit of the Funds and, thus, indirectly themselves) the contributions they contend the record companies should have paid to the Funds from the time the companies started fronting expenses for the singers and deducting those expenses from their royalties to the day plaintiffs filed their suit. The plaintiffs amended their complaint twice.[10] In 1996, after the Funds Trustees rejected the plaintiffs' demand that they bring suit against the record companies (for the Funds contributions the plaintiffs contend were due), they filed a second amended complaint (the "complaint")

---

[8]AFTRA may have foregone suit because it would be unable to establish that, during the negotiations over the 1959 amendment to the Phono Code, the meaning of the phrase gross compensation was discussed. The court, lacking evidence of the parties' mutual intent, would have no choice but to "leave the parties where it found them." *Reynolds v. Roberts,* 202 F.3d 1303, 1316-17 (11th Cir.2000) (quoting 4 *Williston on Contracts* § 627 (3d ed.1961)). The record indicates that the Funds Trustees chose not to litigate the issue because (1) the chance that they would prevail was far from clear, and, if they lost the case, the Funds' assets would be depleted, and (2) their periodic audits of the record companies' semi-annual statements to the singers had produced adequate resolutions of the singers' claims that the companies had under-reported gross compensation, and thus the amount of the contribution due the Funds.

[9]The definition includes within gross compensation a few of the expenses the record companies had been fronting for the singers and deducting from their royalties.

[10]The district court dismissed the plaintiffs' complaint in part for failure to exhaust the administrative remedies provided by ERISA. *See Mason v. Continental Group, Inc.,* 763 F.2d 1219 (11th Cir.1985). The plaintiffs subsequently exhausted these remedies. The exhaustion of remedies is not an issue in these appeals.

which seeks recovery of sums allegedly due from the Record Company Defendants for the period extending from the 1970s to the 1995 amendment of the Phono Code.[11]

The plaintiffs' complaint resembles the "shotgun" pleading we condemned in *Pelletier v. Zweifel,* 921 F.2d 1465, 1518-19 (11th Cir.1991). It is 96 pages long with 232 numbered paragraphs; each count incorporates by reference all previous paragraphs. Counts I, II, IV, V, VI, and VII are implicated in these appeals. Counts II, V, VI, and VII are here because the district court refused to certify them as class actions. Counts I and IV are here because the district court dismissed them for failure to state a claim for relief. *See* Fed.R.Civ.P. 12(b)(6). In part II, we review the court's refusal to grant class certification; in part III we review the court's Rule 12(b)(6) rulings.

II.

A district court's decision to grant or deny class certification is discretionary; hence, we review the court's decision under the abuse-of-discretion standard. *Hudson v. Delta Air Lines, Inc.,* 90 F.3d 451, 455 (11th Cir.1996); *see also Armstrong v. Martin Marietta Corp.,* 138 F.3d 1374, 1381 (11th Cir.) (en banc) ("[D]enials of class certification usually stand."), *cert. denied,* 525 U.S. 1019, 119 S.Ct. 545, 142 L.Ed.2d 453 (1998).

In order to obtain class certification of Counts II, V, VI, or VII, the plaintiffs had to satisfy all four of the conditions of Rule 23(a) of the Federal Rules of Civil Procedure:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, plaintiffs had to demonstrate that one of the three conditions of Rule 23(b), subsections (1), (2), or (3) applied: that either (1) prosecution by separate actions would create a risk of inconsistent results; (2) the defendant has acted in ways generally applicable to the class, making declaratory or injunctive relief

---

[11]In the discussion that follows, we refer to the sums allegedly due from the Record Company Defendants as the "delinquencies."

**6**

appropriate; or (3) common questions of law or fact predominate over individual issues. With these requirements in mind, we consider whether the district court abused its discretion in denying class certification on Counts II, V, VI, and VII.

A.

Counts II, V, and VI are similar in that they allege that the Funds Trustees breached their fiduciary duty to the Funds when they decided not to sue the Record Company Defendants for the delinquencies. Given this similarity, we review collectively the district court's decisions whether to certify these counts as class actions.[12]

In order to determine whether, with respect to any of the eighteen plaintiffs or any of the putative class members, a particular Record Company Defendant owes the Funds anything, the district court would have to examine each singer's contract with the record company. Because the singers' contracts with the record companies were not identical—in terms of the royalties to be paid the singers and the parties' allocation of expenses—only by undertaking such examination could the court know what expenses the record company fronted the singer and thus the expenses that should or should not have been included as gross compensation in the company's semi-annual statement. The district court also would have to take into account the fact that the Funds Trustees periodically reviewed the record companies' semi-annual statements to determine the accuracy of the information the record companies reported.[13] Not infrequently, such audits resulted in an increase in a company's contribution to the Funds. In sum, each case—those of the named plaintiffs and the putative class members as well—is different: the financial arrangements and the steps the Trustees took to ensure the record companies compliance with the Phono Code differ.

---

[12]The district court based its decisions on the allegations of the plaintiffs' complaint, the Funds Trustees' responsive pleadings, various pieces of evidence obtained by the parties in discovery, and, of course, the arguments of counsel.

[13]The Funds Trustees generally conducted these audits following a singer's complaint that the semi-annual statement was inaccurate, but sometimes the Trustees conducted them on their own initiative, as spot checks.

7

Under these circumstances, it is doubtful, at the very least, that the plaintiffs satisfied the third condition of Rule 23(a). It is also doubtful that the plaintiffs satisfied any of the conditions of Rule 23(b). Having drawn these conclusions, we could hardly say that the district court abused its discretion in refusing to certify a class for Counts II, V, and VI. We therefore affirm the ruling the court certified for appeal under 28 U.S.C. § 1292(b).

B.

Plaintiffs bring Count VII under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (1994), which prohibits "any person employed by or associated with any enterprise engaged in ... interstate commerce, to conduct or participate ... in the conduct of such enterprise's affairs though a pattern of racketeering activity." Section 1962(c) does not create a civil remedy for engaging in such conduct. We assume that the plaintiffs meant to posit Count VII on 18 U.S.C. § 1964(c) (Supp. II 1996), which does creates a civil damages action for "[a]ny person injured in his business or property by reason of a violation of section [1962(c). Such a person] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains...." Count VII alleges that the Funds are an "enterprise," and that the Record Company Defendants associated with such enterprise "conduct[ed] or participate[d] ... in the conduct of such enterprise's affairs through a pattern of racketeering activity," specifically, the crime of mail fraud. The fraud consisted of the semi-annual statements that the Record Company Defendants sent to the plaintiffs and the putative class members (and the Funds). These statements were fraudulent because they misrepresented the singer's gross compensation. For example, if the record company paid a third party to whom the singer was indebted, treated the payment as a loan to the singer, and deducted the payment from the royalties due the singer, the company did not treat the payment as compensation and, thus, did not treat it as part of the singer's "gross compensation." According to the plaintiffs, the payment to the third party should have been treated as compensation. Because the record

8

companies "mailed" the semi-annual statements, Count VII alleges, each mailing constituted the offense of mail fraud.

We assume for sake of discussion that Count VII alleges a case sufficient to withstand a motion to dismiss for failure to state a claim, in that the record companies, including those in this case, "(1) intentionally participate[d] in a scheme to defraud [the singers] of money or property and (2) use[d] the mails ... in furtherance of that scheme." *Pelletier,* 921 F.2d at 1498. We also assume that Count VII alleges the elements of a section 1964(c) damages suit by alleging "not only that the mail ... fraud statute[ ] ha[s] been violated, but also that [the plaintiffs have] suffered injury as a result of the violation," *id.* at 1499, in that they "relied to [their] detriment on [the defendants'] misrepresentations made in furtherance of that scheme," *id.* at 1499-1500 (citing *O'Malley v. O'Neill,* 887 F.2d 1557, 1563 & n. 9 (11th Cir.1989)). Having indulged these assumptions, we now consider whether the district court abused its discretion in refusing to certify Count VII as a class action.

Whether Count VII is appropriate for class treatment depends on what "questions of law or fact [are] common to the [putative] class," and what "questions of law or fact" are not. Fed.R.Civ.P. 23(a)(2). Most of the questions of fact are not common. Every singer had a different recording contract with his or her record company; in fact a singer may have had several contracts. The terms of a particular contract, including the allocation of expenses, depended on the negotiating skills of the singer's agent. The terms also depended on the singer's popularity and ability to generate revenue. The singers' reactions to the record companies' semi-annual statements also differed from singer to singer. Some found no error in the statements and accepted them at face value; some relied on their agents to monitor the statements, and they likewise found no error; others spotted what they perceived to be errors and complained to AFTRA; still others complained directly to the Funds Trustees, who may or may not have conducted an audit. For a court to determine which statements contained errors would be a monumental task that could not be reasonably undertaken in one lawsuit.

**9**

When all is said and done, we find only two facts that are common to the RICO claims of the named plaintiffs and the putative class members: one is a collective bargaining agreement, the Phono Code; the other is that the record companies sent the singers' semi-annual statements through the mails. It requires no extensive analysis to conclude that this is not enough to satisfy the requirements of Rules 23(a) and (b). Rule 23(a)'s third condition—that the named plaintiffs' claims are typical of the claims of the putative class members—is not satisfied. In fact, the claim of one named plaintiff is not typical of the claim of another named plaintiff. And none of Rule 23(b)'s three conditions is satisfied: (1) the prosecution of separate actions would not create a risk of inconsistent results (because each plaintiffs' factual scenario is different); (2) neither declaratory nor injunctive relief would be appropriate (because the Phono Code has been amended to eliminate the ambiguity that lead to this suit); (3) common questions of law and fact do not predominate over individual issues, *see Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228 (11th Cir.2000) (citing *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir.1997)). We therefore conclude that the district court acted well within its discretion in denying class certification with respect to Count VII.

III.

We now turn to the meat of the this appeal, and a question of first impression in this circuit. The district court dismissed plaintiffs' derivative delinquent contribution claim, Count I, predicated on ERISA section 502(g)(2), 29 U.S.C. § 1132(g)(2), on the grounds that ERISA does not allow "an action for damages

**10**

against non-fiduciaries."[14] We review *de novo* the grant of a motion to dismiss for failure to state a claim for relief. *See Long v. Satz,* 181 F.3d 1275, 1278 (11th Cir.1999).

A.

By asserting a derivative delinquent contribution claim, the plaintiffs assume that they are entitled to step into the shoes of the Funds Trustees and prosecute a cause of action—to collect the delinquencies due from the Record Company Defendants on behalf of the Funds—that only Funds Trustees have standing to bring. Two circuit courts, the Second and Third, have afforded beneficiaries of an ERISA-governed plan standing to prosecute a suit that only the plan trustees have the express authority to bring. *See Diduck v. Kaszycki & Sons Contractors, Inc.,* 874 F.2d 912, 916 (2d Cir.1989); *McMahon v. McDowell,* 794 F.2d 100, 109 (3d Cir.1986); *Struble v. New Jersey Brewery Employees' Welfare Trust Fund,* 732 F.2d 325, 336-37 (3d Cir.1984). Drawing on traditional trust law, these courts held that, in order to bring a derivative suit for the recovery of delinquent contributions, a beneficiary must first establish that the trustees refused to sue and that their refusal amounted to a breach of their fiduciary duty to the plan. *See Diduck,* 874 F.2d at 916, *McMahon,* 794 F.2d at 109, *Struble,* 732 F.2d at 336-37. Neither circuit, however, has treated the beneficiary's standing to sue as a matter of statutory construction,[15] and neither circuit has considered the issue

---

[14]The district court cited *Useden v. Acker,* 947 F.2d 1563, 1581-82 (11th Cir.1991), for the proposition that our precedent forbids such a cause of action. *Useden,* however, does not stand for that proposition. In *Useden,* the trustee of a profit-sharing plan brought breach-of-fiduciary-duty claims against a bank and a law firm. The trustee alleged that the bank, which had made a loan to the plan and, on default, had seized the collateral securing the loan, and the law firm, which had been advising the plan regarding the loan, had violated various provisions of ERISA. We held that neither the bank nor the law firm qualified as fiduciaries. *Id.* at 1572-79. As an alternative to fiduciary liability, the trustee asserted that the bank and law firm could be liable as non-fiduciaries for participating in a breach with an ERISA fiduciary. Although the opinion in *Useden* is not entirely clear, it appears the trustee was alleging that the bank and the law firm had conspired with the trustee's predecessors to violate ERISA. We held that "there is no cause of action for monetary damages under ERISA sections 409(a) or 502(a) for the participation of a non-fiduciary in a fiduciary breach." *Id.* at 1582. The question now before us is different—whether a plan beneficiary has standing to sue derivatively *on behalf of the plan,* where the beneficiary alleges that the plan trustees have refused to sue and thus have breached their fiduciary duty to the plan.

[15]These courts also did not consider the legislative history of section 502(g)(2), which, as we demonstrate *infra,* strongly suggests Congress did not intend to provide for derivative delinquent contribution suits.

**11**

in light of the Supreme Court's rulings in *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 257-63, 113 S.Ct. 2063, 2069-72,124 L.Ed.2d 161 (1993) and *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 145-48, 105 S.Ct. 3085, 3092-93, 87 L.Ed.2d 96 (1985), both of which warned lower courts to avoid reading new causes of action into ERISA.[16]

In interpreting a statute, we look first to the plain meaning of the statute. *See Watt v. Alaska,* 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). We may look to evidence of Congressional intent outside the four corners of the statute if "(1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent." *United States v. DBB, Inc.,* 180 F.3d 1277, 1281 (11th Cir.1999).[17]

---

[16]In *Mertens,* 508 U.S. at 257-63, 113 S.Ct. at 2069-72, the Court, agreeing with our decision in *Useden, see supra* note 14, held that ERISA does not authorize a suit for money damages against a non-fiduciary who knowingly participates in a breach of fiduciary duty. In *Russell,* 473 U.S. at 138, 105 S.Ct. at 3088, the Court held that a fiduciary could not be held liable under ERISA for extracontractual compensatory or punitive damages for the untimely processing of benefits claims.

[17]Plaintiffs point us to language in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 108-09, 109 S.Ct. 948, 953-54, 103 L.Ed.2d 80 (1989), and *Useden,* 947 F.2d at 1581-82, which, they assert, stands for the proposition that ERISA incorporates traditional trust law "procedural devices and principles." Thus, they argue, since a derivative suit by a beneficiary was allowed at common law, *see* A. Scott, *Law of Trusts,* § 282.1 (3d ed.1967), we should read this remedy as part of the background of ERISA. We reiterate that our first job is to give effect to the plain meaning of the statute, and if this leads to an ambiguous or absurd result, then we attempt to effectuate Congress' intent through other materials. *See DBB, Inc.,* 180 F.3d at 1281. Moreover, we do not read *Useden* as incorporating the entire body of trust law into ERISA. Our court was careful to avoid exactly that:

> Thus, while it is obvious that ERISA is informed by trust law, the statute is, in its contours, meaningfully distinct from the body of the common law of trusts. A method of interpretation consonant with this realization will reject the unselective incorporation of trust law rules into ERISA. Rather, a court should only incorporate a given trust law principle if the statute's text negates an inference that the principle was omitted deliberately from the statute. ERISA is a "comprehensive and reticulated statute," *Nachman Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980), bearing the marks of circumspect drafters; courts should proceed with commensurate circumspection before concluding that a prominent feature of trust law was omitted from the statute merely through inadvertence.

*Useden,* 947 F.2d at 1581.

**12**

B.

ERISA section 502(a)(1) allows a "participant or beneficiary" to bring an action only "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Here, the plaintiffs, in Count I, do not bring such an action; accordingly they must base their claim on another provision of ERISA. They point to section 502(g), which provides in relevant part:

> (1) In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.
>
> (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—
>
>> (A) the unpaid contributions,
>>
>> (B) interest on the unpaid contributions,
>>
>> (C) an amount equal to the greater of—
>>
>>> (i) interest on the unpaid contributions, or
>>>
>>> (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
>>
>> (D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and
>>
>> (E) such other legal or equitable relief as the court deems appropriate.

29 U.S.C. § 1132(g).[18]

---

[18]Section 1145 provides:

> Every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145 (1994).

**13**

Thus, by the plain meaning of the statute, Congress set up the following remedial scheme. In a suit brought by "a participant, beneficiary, or fiduciary" Congress gave the courts, in subsection (1), discretion to award attorney's fees and costs. But, in subsection (2), it only gave the courts the power to award the plan "unpaid contributions" and "interest" on such contributions in a suit brought "by a fiduciary for or on behalf of the plan."

Such a distinction makes perfect sense. Congress provided for an award of attorney's fees in subsection (1) so that beneficiaries, whose claims may be small, could attract the attention of competent attorneys to litigate their claims. But the reason for the laundry list of remedies in subsection (2) is different. The benefits of a lawsuit brought by a fiduciary accrue to the plan as a whole (and thus indirectly to the beneficiaries as a whole); but so do the costs. A fiduciary must, in performing his fiduciary duty, weigh the costs of litigation (including the risk of failure) against those benefits. By allowing the award of not only the unpaid contributions, but also interest, attorney's fees, and "other legal and equitable relief," Congress put its hand on the scale favoring litigation. In the end, Congress wanted to be sure that the *beneficiaries* received everything due them.

The passage of ERISA did not change the common law rule that fiduciaries of a plan have a breath of discretion in deciding when, and if, to bring an action to enforce the plan's rights. *See Alfarone v. Bernie Wolff Constr. Corp.,* 788 F.2d 76, 80 (2d Cir.1986) (holding that trustee's "refusal to file a suit to recover contributions allegedly due," does not, by itself, constitute a breach of fiduciary duty under ERISA). *Cf., e.g., Seven G. Ranching Co. v. Stewart Title & Trust,* 128 Ariz. 590, 627 P.2d 1088, 1090 (1981) ("[A] trustee can properly compromise, submit to arbitration or abandon claims affecting the trust property provided that in so doing he exercises reasonable prudence."). There are many reasons why a fiduciary may choose, in his discretion, not to bring a lawsuit against a third party; this is true even if the chances of success are good. *See Restatement (Second) of Trusts,* § 192, cmt. c (1959) (stating a trustee may abandon a claim if the "expense of litigation or the character of the claim would make it reasonable not to bring suit ... "). In fact,

in some situations, a fiduciary could win a lawsuit against an employer under section 502(g)(2), but the failure to bring such a suit would be insufficient to prove a breach of fiduciary duty, because of the discretion given the fiduciary. *Cf. Alfarone,* 788 F.2d at 76-80. By allowing any beneficiary willing to allege a breach of fiduciary duty to bring a derivative suit, the Second and Third Circuits have permitted that beneficiary to substitute his or her judgment for that of the trustees'.

Even if we agreed with the plaintiffs that section 502(g) does not unambiguously preclude their prosecution of Count I, the legislative history of section 502(g) demonstrates that Congress intended that only fiduciaries should have standing to sue on behalf of a plan for delinquent contributions. Section 502(g) was added as part of the 1980 amendments to ERISA. *See* Multi-employer Pension Plan Amendments Act of 1980, P.L. 96-364, 94 Stat. 1208 (codified in scattered sections of 29 U.S.C.). The House version of the bill, passed by the House on May 22, 1980, contained the following language:

> In any civil action against any person to collect delinquent contributions to or under a multi-employer plan, if the plan so provides the court may award the plaintiff—
>
>> (1) a reasonable attorney's fee and cost of action, and
>>
>> (2) liquidated damages (not in excess of 20 percent of the delinquency as determined by the court).
>
> Nothing in the preceding sentence shall be construed to limit any remedy permitted under any other provision of Federal or State law.

*See* H.R. 3904, 96th Cong., § 305 (1980), 126 Cong. Rec. 12,200, 12,221 (1980).[19] The Senate version contained the language that now appears as section 502(g)(2). *See* S. 1076, 96th Cong., § 306 (1980);[20] *see also* Senate Committee on Labor and Human Resources, 96th Cong., S. 1076, The Multi-employer Pension

---

[19]This section was not part of the bill when it was originally introduced in the House and Senate; it apparently was added while the bill was in the House committee.

[20]As best we can tell from the legislative history of the Multiemployer Pension Plan Amendments Act of 1980, the language that now appears as section 502(g)(2) of ERISA began as section 308 of Senate bill 1076. *See* S. 1076, 96th Cong., § 308 (May 3, 1979). By July 24, 1980, however, the Senate had moved the language to section 306. *See* P.L. 96-364, § 306, 94 Stat. at 1295.

Amendments Act of 1980: Summary and Analysis of Consideration 44 (Comm. Print 1980) ("Federal pension law must permit *trustees of plans* to recover delinquent contributions efficaciously.") (emphasis added). Thus, when the bill went to conference committee, the decision was made to eliminate the House provision, which did not specify who could bring "a civil action ... to collect delinquent contributions." Given this legislative history, we do not believe that Congress wanted beneficiaries to have standing to bring suit on behalf of the plan for delinquent contribution. *See J. Truett Payne Co., Inc. v. Chrysler Motors Corp.,* 451 U.S. 557, 562-63, 101 S.Ct. 1923, 1927-28, 68 L.Ed.2d 442 (1981) (refusing to adopt reading of statute explicitly dropped during conference committee); *Gulf Oil Corp. v. Copp Paving Co., Inc.,* 419 U.S. 186, 200, 95 S.Ct. 392, 401, 42 L.Ed.2d 378 (1974) (stating that when a conference committee deletes a provision, "its action strongly militates against a judgment that Congress intended a result that it expressly declined to enact"); *Hussion v. Madigan,* 950 F.2d 1546, 1552 n. 7 (11th Cir.1992) (same).

Our holding does not leave beneficiaries without a remedy when the trustees, in breach of their fiduciary duty, unreasonably refuse to sue to recover delinquent contributions. Congress provided that trustees who breach their fiduciary duty "shall be personally liable to make good to [the] plan any losses resulting from each such breach," ERISA § 409(a) (codified at 29 U.S.C. § 1109(a) (1994)), and provided for a cause of action by a beneficiary for such a breach in section 502(a)(2). If the fiduciary is judgment proof or continues to refuse to sue to collect delinquent contributions, the court can order "such ... equitable or remedial relief ... including removal ... of such fiduciary," § 409(a).

IV.

Count IV of the plaintiffs' complaint is a "claim" against the Record Company Defendants for equitable relief under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3). The district court dismissed Count IV for failure to state a claim for relief, and the plaintiffs challenge its ruling.

Section 502(a)(3) allows a civil action

by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief

**16**

(i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.[21]

29 U.S.C. § 1132(a)(3).

We need not tarry long in disposing of the plaintiffs' challenge. Count IV contains no allegation, within the four corners of that count, that the Record Company Defendants violated a substantive provision of ERISA or the terms of the Funds. To be sure, Count IV incorporates, by reference, all of the 181 paragraphs preceding it. Imbedded in these paragraphs are allegations that the Record Company Defendants failed to carry out their obligations under the Phono Code—specifically, to contribute a percentage of the singers' gross compensation to the Funds. We would be in serious dereliction of our appellate duty, however, if we allowed this sort of "shotgun pleading" to substitute for, at a bare minimum, an allegation of what law these defendants purportedly broke. *Johnson Enter., Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1333 (11th Cir.1998); *see also Ebrahimi v. City of Huntsville Bd. of Educ.,* 114 F.3d 162, 165 (11th Cir.1997); *Pelletier,* 921 F.2d at 1518. We therefore affirm the district court's dismissal of Count IV.

V.

For the foregoing reasons, the district court's order denying class certification on Counts II, V, VI, and VII, and its judgment dismissing Counts I and IV are affirmed.

AFFIRMED.

---

[21]In Count IV of their complaint, plaintiffs sought three remedies they claim fall under this section: (1) "an accounting of all 'Gross Compensation' rightfully payable to [them] and a determination of the correct amount owed to the Funds"; (2) a declaratory judgment resolving the meaning of "gross compensation" in the Phono Code; and (3) attorney's fees and costs. Citing *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), the district court dismissed Count IV on the grounds that section 502(a)(3) does not allow these remedies because "Congress has provided plaintiffs with an appropriate remedy and further equitable relief is not mandated." We need not decide that question here.